[No. 72366-4.   En Banc.]
Argued January 22, 2003.      Decided October 2, 2003.

*In the Matter of the Marriage of* JOHN CHRISTOPHER RIDEOUT, *Respondent,* and SARA DIXON RIDEOUT, *Petitioner.*

338

*Melissa M. Denton* (of *Ascher & Denton*), for petitioner.

*Charles Szurszewski* (of *Connolly Tacon & Meserve*) and *Charles K. Wiggins* and *Kenneth W. Masters* (of *Wiggins & Masters, P.L.L.C.*), for respondent.

*Matthew I. Cooper* on behalf of Washington State National Organization for Women, amicus curiae.

*Bryan P. Harnetiaux*, *Catherine Wright Smith*, and *Debra L. Stephens* on behalf of Washington State Trial Lawyers Association Foundation, amicus curiae.

[As amended by order of the Supreme Court October 27, 2003.]

ALEXANDER, C.J. — Christopher Rideout initiated a contempt proceeding in superior court against his former wife, Sara Rideout. In it he alleged that Sara demonstrated a pattern of interference with residential time with their children to which Christopher was entitled pursuant to a court-approved parenting plan and a subsequent court order establishing a summer residential schedule. After a hearing, the superior court held Sara in contempt for what it concluded was her "bad faith" failure to comply with the terms of the court order relating to summer residential time. Sara obtained review of that decision by the Court of Appeals, Division Two, which affirmed the superior court's contempt order. Sara thereafter petitioned for review by this court and we granted her petition. *In re Marriage of Rideout*, 147 Wn.2d 1008 (2002).

We affirm the Court of Appeals, holding that: (1) notwith-standing the fact that the submissions at the contempt proceeding were entirely documentary, the superior court's findings of fact should be given deference and evaluated to determine if there was substantial evidence to support them and (2) a parent may be held in contempt, pursuant to RCW 26.09.160, for failure to make reasonable efforts to require a child to visit the other parent as required by a parenting plan and a court order establishing residential time.

## I. Facts

On April 18, 1995, Christopher Rideout filed a petition in Thurston County Superior Court seeking dissolution of his marriage to Sara Rideout. During the course of the Rideout's marriage, a son, Christopher (Kit) (birth date July 23, 1989), and a daughter, Caroline (birth date Aug. 1, 1987), were born to the Rideouts. Establishing the residential schedule for these children was the focal point of the highly contested dissolution proceeding.

On August 25, 1997, the superior court entered a decree dissolving the Rideout's marriage and approving a permanent parenting plan. The plan provided that Sara was to have the children "the majority of the time," except that Christopher and Sara would alternate weekends with the children. Clerk's Papers (CP) at 7. Concerning the summer residence of the children, the parenting plan provided that Kit and Caroline would reside with Sara except for a four-week period when the children were to be with Christopher. Christopher's summer residential time was to be taken in "one or two blocks of time, at the father's option." CP at 5. The parenting plan called for a continuation of the alternating weekend residential schedule during the summer, except when the children were out of the area during a planned vacation. The plan specified that, in the absence of a contrary agreement between Christopher and Sara, each summer block "shall begin at 5 P.M. on Friday and

conclude at 8 P.M. Sunday." CP at 6. Christopher and Sara later agreed that the "blocks of time" would begin on Fridays at 2:30 P.M. as opposed to Fridays at 5 P.M. *See* CP at 16; *see also* CP at 14. Transportation of the children for all scheduled residential times was to be provided by "the parent receiving the child(ren)." CP at 7.

The parenting plan also provided that Christopher was to have residential time with Caroline on her birthday in "odd" years. CP at 7. Sara and Christopher later agreed to follow a schedule for special occasions, which included holidays, that is "the opposite of the [schedule] in the parenting plan." CP at 56. Per their agreement, "[Christopher] was to have . . . Caroline, for her thirteenth birthday on August 1, 2000." CP at 65; *see* CP at 56. It is an alternate weekend residential time, Christopher's scheduled residential time with Caroline on her 13th birthday, and Christopher's scheduled four-week residential time during the summer of 2000 that are particularly pertinent to the issues in this case.

Beginning on June 18, 2000, Christopher left several telephone messages for Sara in which he set forth the dates he wished to exercise his summer residential time with their children.[1] Specifically, he indicated that he had requested "four weeks of visitation with both of my children beginning on July 14, 2000, and continuing for four consecutive weeks." CP at 12. He said that during the third and fourth week of the residential time they would be "out of town" for a family reunion in Idaho. *Id.* July 14, 2000, was also the first day of a weekend on which Christopher was entitled to residential time with the children, pursuant to the alternate weekend residential time provision of the parenting plan. Christopher followed his telephone calls with a July 11, 2000, letter to Sara, in which he reiterated the dates he wished to have the children with him that

---

[1] Though the parenting plan specifies that Christopher's summer residential "blocks of time" are to be at his option, Sara "admit[ted]" in a declaration that "[a]s to the specifics of the [summer residential] schedule, . . . [i]t has been [her] role to coordinate visitation." CP at 5, 32.

summer. Christopher's attorney also sent Sara a letter on July 14, 2000, in which he specified the same dates. In a letter to her attorney dated July 14, 2000, Sara indicated that "[t]he first that [she] heard of Chris[topher's] vacation plans was through voice mail in [her] office which [she] picked up on July 10." CP at 19.

On July 14, 2000, Christopher went to Sara's home to pick up the children for his weekend and summer residential time. Neither Sara nor the children were then at the home. Later that day, Kit called his father who then went back to Sara's house in order to pick him up. When Christopher was at Sara's house collecting Kit, he was told that Caroline was horseback riding and that she would be delivered to Christopher's home later that day. However, Sara telephoned Christopher that day to tell him that Caroline was going to be staying with her instead of going with Christopher. The following day, Christopher again went to Sara's house in an effort to obtain Caroline. Sara's boyfriend answered the door and declined to supply Christopher with any information regarding Caroline's whereabouts.

On July 18, 2000, Christopher sought an order from the Thurston County Superior Court establishing specific dates for his summer residential time. In response, Sara filed a declaration in which she stated that "Chris[topher] Rideout is taking me to court, but his dispute is with our daughter. Since she is still a minor, she is at a great disadvantage in this dispute and I get dragged into the middle of it no matter how hard I try to stay out." CP at 27. On July 27, 2000, the superior court entered an order which provided that Christopher was to have residential time with Caroline from July 27, 2000, through August 24, 2000. The order also required Sara to transport Caroline to Christopher's house at 4:00 P.M. on that day. Sara did not deliver the child to Christopher as she had been ordered.

Based on Sara's alleged failure to comply with the alternate residential time awarded to Christopher, as set forth in the parenting plan, Christopher brought a motion for an

order holding Sara in contempt of court. He alleged in his motion, which was filed on the same day that the order establishing Christopher's summer residential time was entered, that Sara "ha[d] engaged in a pattern of deliberately interfering with the alternate residential time awarded to . . . Christopher . . . pursuant to the . . . Parenting Plan." CP at 48. Specifically, he indicated that Sara most recently violated the parenting plan when she "refused to make . . . Caroline available for weekend residential time [from] July 14-16, 2000," and when she "withheld Caroline . . . on the following weekend of July 21-23, 2000." CP at 48. An order to show cause why Sara should not be held in contempt was then served on her. Sara responded, maintaining that because Caroline refused to visit with her father, Sara had not violated the residential time order. In a declaration filed on August 1, 2000, Sara stated that Caroline did not want to spend time with her father, indicating that "I have tried every method of persuasion available to me to encourage my daughter to visit with her father[, but] Caroline adamantly refuses to go visit him." CP at 51.

On August 3, 2000, based on Sara's alleged "failure to comply with the . . . Parenting Plan . . . and with the Order to Set Dates Re Summer Visitation," Christopher filed a second motion for contempt against Sara. In that motion, Christopher stated that "I have not seen Caroline since July 13, 2000." CP at 55-56. He further declared that "I have already filed a motion regarding denial of my alternate weekend visitation. . . . I have not had any alternate weekend visitations." CP at 56.

A show cause hearing on both show cause orders was held before a superior court commissioner on August 17, 2000. It focused on (1) the provisions of the parenting plan relating to alternate weekend residential time, (2) the parties' mutual agreement that Christopher would have residential time with Caroline on her 13th birthday, and (3) Sara's alleged failure to comply with the July 27, 2000, order regarding summer residential time. Christopher and Sara were each represented by attorneys at this hearing.

The record before the court commissioner included numerous declarations filed separately by Christopher and Sara, including the declarations referred to above. Some of Sara's declarations were filed in relation to Christopher's motion to establish dates for summer residential time and in relation to his motion to enforce the alternate weekend residential time set forth in the parenting plan. Other declarations were in relation to a motion "for family counseling, for permission to travel and for attorney fees," which Sara filed on August 1, 2000.[2] CP at 50. Finally, others were filed in relation to the motions for contempt brought by Christopher. In her declarations, Sara consistently maintained that any dispute about Caroline's residential time with Christopher was between Caroline and her father.

Some of Christopher's declarations described a pattern of behavior by Sara during the summers of 1998, 1999, and 2000 in which Sara allegedly failed to comply with the parenting plan insofar as it provided for Christopher's summer and alternate weekend residential time with Caroline. More specifically, Christopher alleged that in the summer of 1998, he planned to take Caroline and Kit with him on vacation during a portion of his four weeks of summer residential time with the children. Christopher indicated that shortly before they were to leave for the vacation, Sara called him to say that Caroline would not be going on vacation with him and that he could come over to her home and "drag Caroline out." CP at 13. Christopher claimed that, as a consequence, he "[r]eluctantly . . . forfeited a week and a half [of his summer residential time]." *Id.*

In addition, Christopher declared that in the summer of 1999, as he was planning to leave on a two-week trip with the children, Sara called Christopher to say that Caroline was ill. Christopher indicated that he waited two days for Caroline to recover from her illness, but was then informed by Sara that Caroline was still ill. Again, Christopher had a shortened summer residential time with Caroline.

---

[2] That motion was denied by the superior court.

Sara presented a declaration, purportedly written by Caroline on July 25, 2000, expressing Caroline's views as to residential time with her father. In this declaration, Caroline purportedly indicated that she called her father "hoping to negotiate a plan involving the rest of [the] summer." CP at 126. She indicated that Christopher told her that "all of the 'hassle' about the parenting plan was [her] fault." *Id.* She further stated that "I don't want to spend four weeks with my father this summer." *Id.* In response, Christopher presented a declaration, in which he indicated that he was "confident that this declaration is not a free expression of my daughter." CP at 40.

After considering the declarations and argument of counsel, the court commissioner entered findings of fact and conclusions of law. Among the findings of fact are the following:

2. That parenting plan included provisions for summer residential time with both parents. Specifically, the plan indicated that during the summer the children reside with the father (a) for alternate weekend visitation, (b) for one or two blocks totaling four weeks, and (c) for alternating birthdays. The remaining time was to be spent with the mother, unless otherwise agreed.

3. The father provided notice to the mother of proposed times for this summer. The mother disagreed.

. . . .

5. After the father submitted his request for summer visitation, the mother denied access to his daughter (a) for the four week period, (b) for the every other weekend schedule, and (c) and for the daughter's thirteenth birthday. . . .

6. An Order to Set Dates Re: Summer Visitation was signed by [the superior court] on July 27, 2000. The terms of that order required the mother to deliver the daughter to the father on July 27, 2000, at 4:00 P.M.

7. Although the mother went to the father's home in the afternoon and evening on July 27, 2000, first to pick up and then to deliver the parties' son, she did not deliver the daughter, as required by the court order entered earlier

that day. As of the hearing of August 10, 2000, the mother had still not delivered the daughter to her father.

. . . .

10. The mother has overly involved the minor daughter in this action, including facilitating the daughter's signing a statement which was filed in this action.

11. Ms. Rideout is an intelligent, competent, and capable parent with the ability to cause her thirteen year old to comply [with] the court's orders, yet the mother has failed to do so. She was charged with a duty to comply with an order, had the ability to comply, and failed to do so.

12. The parties agree that the father was to have the daughter, Caroline, for her thirteenth birthday on August 1, 2000. The mother did not make the daughter available to the father on her birthday. . . .

13. Ms. Rideout failed to comply with the terms of the parenting plan by not allowing for every other weekend visitation on at least one occasion.

. . . .

16. The fact that the daughter does not live on her own and has lived in the home of the mother is evidence that the mother could have caused the daughter to visit her father.

CP at 64-65.

Based on these findings of fact, the court commissioner held that Sara was responsible for making reasonable efforts to ensure Caroline's compliance with the residential time order, reasoning that "[a] child of twelve or thirteen is not of a sufficient age and maturity that she can be given decision-making authority over whether visitation occurs." CP at 65. The commissioner also concluded that:

3. Although the mother failed to comply with the terms of the parenting plan by not allowing for every other weekend visitation, her actions do not rise to the level of bad faith.

4. [However, a] finding of contempt, warranted by bad faith, should be entered for the mother's refusal or failure to comply with the terms of the court's order of July 27, 2000.

CP at 65-66.

The court commissioner held, finally, that Sara was in contempt of the court pursuant to the provisions of RCW 26.09.160. He then entered judgment against Sara for "$100 per day" from "July 27, 2000 through August 16, 2000." CP at 66. Although Christopher had requested an award of attorney fees and costs in the amount of $3,349.32, the commissioner ordered Sara to pay the lesser sum of $892.50. Although a superior court judge denied Sara's motion to revise the commissioner's order, the judge entered an additional finding of fact that "[n]othing, prior to July 27, 2000, indicated that the child was reluctant to . . . visit her father." CP at 115.

Sara appealed the superior court's decision to the Court of Appeals, Division Two. Christopher cross-appealed the portion of the decision relating to attorney fees. The Court of Appeals upheld the trial court's determination that Sara was in contempt of court. *In re Marriage of Rideout*, 110 Wn. App. 370, 377, 40 P.3d 1192, *review granted*, 147 Wn.2d 1008, 54 P.3d 1212 (2002). In doing so, it concluded that it would not review the documentary materials and affidavits de novo but would determine only whether substantial evidence supported the trial court's determination that Sara had acted in "bad faith." Upon reviewing the documentary evidence and affidavits, the Court of Appeals concluded that when a child resists residential time, a parent may be held in contempt if he or she either contributed to the child's attitude or failed to make reasonable efforts to make the child comply. The Court of Appeals held that there was sufficient evidence of both grounds. On Christopher's cross-appeal, the Court of Appeals affirmed the amount of attorney fees awarded by the superior court commissioner. It did, however, award Christopher attorney fees on appeal concluding that, as "the prevailing party on appeal," he was entitled to fees pursuant to RCW 26.09.140 and RAP 18.1(f). *Rideout*, 110 Wn. App. at 382.

Sara sought review by this court and we granted it.[3] Two parties were permitted to appear as amici curiae in this case, Washington State National Organization for Women (NOW) and Washington State Trial Lawyers Association Foundation (WSTLAF). NOW asserts that "there should be a standard set of guidelines to the courts which define when appointments of guardians ad litem must be made in high conflict cases involving contempt of parenting plan final orders." Amicus Curiae Br. of NOW at 4. WSTLAF's brief supports Sara on the issue of de novo review, asserting that "[n]o court, . . . whether a superior court in the first instance or an appellate court exercising de novo review, should resolve credibility issues that may be outcome determinative of a pivotal factual question in the contempt proceeding on a documentary record." Br. of Amicus Curiae WSTLAF at 4.

## II. Standard of Review

An attempt by a parent to refuse to perform a duty provided in a parenting plan is deemed to be bad faith. RCW 26.09.160. If a trial court finds after a hearing that a parent has "not complied with the order establishing residential provisions" of a parenting plan in "bad faith," the court "shall find" the parent in contempt of court. RCW 26.09.160(2)(b).[4]

▮▮▮ The contempt proceeding in this case was consid-

---

[3] Christopher did not seek review of the Court of Appeals decision regarding attorney fees.

[4] RCW 26.09.160 is contained in chapter 26.09 RCW. The policy behind that chapter was pronounced by the legislature in RCW 26.09.002, as follows: "Parents have the responsibility to make decisions and perform other parental functions necessary for the care and growth of their minor children. In any proceeding between parents under this chapter, the best interests of the child shall be the standard by which the court determines and allocates the parties' parental responsibilities. *The state recognizes the fundamental importance of the parent-child relationship to the welfare of the child, and that the relationship between the child and each parent should be fostered unless inconsistent with the child's best interests.* The best interests of the child are served by a parenting arrangement that best maintains a child's emotional growth, health and stability, and physical care. Further, the best interest of the child is ordinarily served when the existing pattern of interaction between a parent and child is altered only to the extent

ered by the superior court commissioner and the reviewing superior court judge solely on written submissions, including declarations and affidavits.[5] Neither Sara nor Christopher objected to this procedure. Preliminarily at issue is what is the proper standard of review under such circumstances. In conducting its review, the Court of Appeals determined that the standard of review is whether the trial court's findings of fact were supported by "substantial evidence" and "whether the findings support the conclusions of law." *Rideout*, 110 Wn. App. at 377. In determining that the findings of fact were to be reviewed for "substantial evidence," the court rejected Sara's contention that it review the record de novo. *Id.*

Sara correctly observes that there are cases that stand for the proposition that appellate courts are in as good a position as trial courts to review written submissions and, thus, may generally review de novo decisions of trial courts that were based on affidavits and other documentary evidence. *See, e.g., Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 125 Wn.2d 243, 252, 884 P.2d 592 (1994); *Smith v. Skagit County*, 75 Wn.2d 715, 718, 453 P.2d 832 (1969); *In re Marriage of Flynn*, 94 Wn. App. 185, 190, 972 P.2d 500 (1999); *Danielson v. City of Seattle*, 45 Wn. App. 235, 240, 724 P.2d 1115 (1986), *aff'd*, 108 Wn.2d 788, 742 P.2d 717 (1987). The aforementioned cases differ from the instant in that they did not require a determination of the credibility of a party. Here, credibility is very much at issue.

We agree with the Court of Appeals that no Washington appellate court reviewing documentary records has weighed credibility. Indeed, the general rule relating to de novo review applies only when the trial court has not *seen* or heard testimony requiring it to assess the credibility of the witnesses. *Progressive Animal Welfare Soc'y*, 125 Wn.2d

necessitated by the changed relationship of the parents or as required to protect the child from physical, mental, or emotional harm." (Emphasis added.)

[5] Only the superior court's decision is at issue because "once the superior court makes a decision on revision, the appeal is from the superior court's decision, not the commissioner's." *State v. Hoffman*, 115 Wn. App. 91, 101, 60 P.3d 1261 (2003).

at 252. Here, where the proceeding at the trial court turned on credibility determinations and a factual finding of bad faith, it seems entirely appropriate for a reviewing court to apply a substantial evidence standard of review.

In seeking review here, Sara relied heavily on the fact that this court had granted review of a decision of the Court of Appeals in *In re Parentage of Jannot*, 110 Wn. App. 16, 37 P.3d 1265 (2002). There, Division Three of the Court of Appeals held that a trial court's decision to deny a motion to modify a child custody provision in a dissolution decree or parenting plan on the basis of affidavits alone, without a hearing, is reviewed for an abuse of discretion and not de novo. Although Sara may have been encouraged by our decision to grant review of Division One's decision in *Jannot*, her optimism was unwarranted since this court recently affirmed the Court of Appeals decision in that case. *In re Parentage of Jannot*, 149 Wn.2d 123, 65 P.3d 664 (2003). In doing so, we recognized that "local trial judges decide factual domestic relations questions on a regular basis" and consequently "stand in a better position than an appellate judge to decide whether submitted affidavits establish adequate cause for a full hearing on a petition to modify a parenting plan." *Id.* at 126.

We hold here that the Court of Appeals correctly concluded that the substantial evidence standard of review should be applied here where competing documentary evidence had to be weighed and conflicts resolved. The application of the substantial evidence standard in cases such as this is a narrow exception to the general rule that where a trial court considers only documents, such as parties' declarations, in reaching its decision, the appellate court may review such cases de novo because that court is in the same position as trial courts to review written submissions. *See, e.g., Smith*, 75 Wn.2d at 718-19.

Although an argument can and indeed has been advanced that the appellate court is in as good a position to judge credibility of witnesses when the record is entirely documentary, we reject that argument. As we noted in

*Jannot*, 149 Wn.2d 123, trial judges and court commissioners routinely hear family law matters. In our view, they are better equipped to make credibility determinations. Having said that, we recognize that where an outcome determinative credibility issue is before the court in a contempt proceeding, it may often be preferable for the superior court judge or commissioner to hear live testimony of the parties or other witnesses, particularly where the presentation of live testimony is requested. In that respect, we agree with the amicus WSTLAF that issues of credibility are ordinarily better resolved in the "crucible of the courtroom, where a party or witness' fact contentions are tested by cross-examination, and weighed by a court in light of its observations of demeanor and related factors." Br. of Amicus Curiae WSTLAF at 14. Here, Sara had a right to request the opportunity to present live testimony pursuant to Thurston County Local Rule 43(e) or CR 43(e)(1), but she failed to make that request.

The procedural safeguards of our court system strongly support the application of the substantial evidence standard of review. As noted, trial courts are better equipped than multijudge appellate courts to resolve conflicts and draw inferences from the evidence. In sum, we affirm the decision of the Court of Appeals, holding that the appropriate standard of review here is not de novo, but rather is whether the trial court's findings of fact are supported by substantial evidence.

## III. The Contempt Order

■ As we have indicated above, a parent who refuses to comply with duties imposed by a parenting plan is considered to have acted in "bad faith." RCW 26.09.160(1). Parents are deemed to have the ability to comply with orders establishing residential provisions and the burden is on a noncomplying parent to establish by a preponderance of the evidence that he or she lacked the ability to comply with the residential provisions of a court-ordered parenting plan or

had a reasonable excuse for noncompliance. *See* RCW 26.09.160(4).

Here, the trial court was confronted with a showing of Sara's failure to comply with a July 27, 2000, order of the trial court requiring her to deliver Caroline to Christopher at a specific time and location. Indeed, Sara does not dispute the fact that she did not comply with that order. Rather, she contends that her failure to comply was not in bad faith because she tried, albeit unsuccessfully, to persuade Caroline to visit her father at the time specified. The trial court did not accept that explanation, determining that Sara was a "competent, and capable parent" with the ability to require her 13-year-old daughter to comply with the court's orders "yet . . . failed to do so." CP at 65.

■ We must first determine if the findings of the trial court should be sustained. That question is easily answered because although Sara challenged the findings of the trial court at the Court of Appeals, she did not challenge any of its findings in her petition for review or in her supplemental brief. They are, therefore, verities. Furthermore, even if she had challenged the findings of the trial court, the challenge would not avail her, since this court is satisfied that the findings are supported by substantial evidence.

The more fundamental question before us is whether a contempt order is appropriate when a child refuses to attend a court-ordered residential time because the parent charged with facilitating that visit has, as the trial court found, either acquiesced in or encouraged the child's refusal to visit? After examining relevant case law from other states,[6] the Court of Appeals answered that question in the

---

[6] *See, e.g., MacIntosh v. MacIntosh,* 749 N.E.2d 626, 630 (Ind. Ct. App. 2001) (where the court rejected the notion that a child's resistance may excuse a missed visitation); *Hartzell v. Norman T.L.,* 629 N.E.2d 1292, 1295 (Ind. Ct. App. 1994) ("[A]n adolescent's refusal to cooperate with scheduled visitation cannot divest a dissolution court of its authority to enforce its visitation orders."); *Clark v. Atkins,* 489 N.E.2d 90, 97 (Ind. Ct. App. 1986) (rejecting mother's argument that her minor children's refusal to visit their father justified her noncompliance with a visitation order); *Hancock v. Hancock,* 122 N.C. App. 518, 471 S.E.2d 415, 420 (1996) (Where the court held that where "the custodial parent does not prevent visitation but takes no action to force visitation when the child refuses to go," a

affirmative and affirmed the trial court's decision to hold Sara in contempt. It did so notwithstanding Sara's argument that Caroline resisted residential time with her father, the court being satisfied that the evidence showed "that the parent has either contributed to the child's attitude or failed to make reasonable efforts to require the child to comply." *Rideout*, 110 Wn. App. at 379.

■ The Court of Appeals correctly noted here that there are no prior Washington decisions directly addressing the question of whether a parent acts in bad faith by acquiescing in the child's refusal to participate in trial-court-ordered residential time. *Rideout*, 110 Wn. App. at 377. Division One of that court once touched upon the issue when it observed that if a recalcitrant teenager refuses to spend time with his or her parent, and "the parent with whom the child is living chooses not to force the issue and notifies the other parent of that decision, punishment by contempt appears to be an inappropriate remedy." *In re Marriage of James*, 79 Wn. App. 436, 445, 903 P.2d 470 (1995). We agree with the Court of Appeals that this statement in the *James* decision was dictum because it had no bearing on the decision that was rendered. *Rideout*, 110 Wn. App. at 378. A later case, also from Division One of the Court of Appeals, is closer to the instant and related to a circumstance where a parent did more than simply acquiesce in the child's choice. The case is *In re Marriage of Farr*, 87 Wn. App. 177, 940 P.2d 679 (1997), in which the court upheld an order holding a father in contempt. In doing so, it concluded that the trial court properly found that the father, though claiming that

contempt order is inappropriate because the parent's action is not willful.); *Smith v. Smith*, 70 Ohio App. 2d 87, 434 N.E.2d 749, 752 (1980) (Where the court, focusing on the young age of the children (five- and eight-years-old), and reasoning that they were too young to make an affirmative and independent choice not to visit their father, order against the mother who argued that her children refused to visit their father despite her encouragement to them to do so. The court reasoned that, given the age of the children, the mother had to do more than simply encourage them to visit their father.); *Commonwealth ex rel. Ermel v. Ermel*, 322 Pa. Super. 400, 469 A.2d 682, 685 (1983) (after finding that the daughter's " 'negative attitude' toward her father [was] a direct result of [her mother's] conduct," the court upheld a contempt order where an 11-year-old girl refused to visit her father).

the child chose not to spend time with his mother, manipulated the child's decision.

■■ Here, the record shows that the trial court carefully examined the voluminous record, including all of the submissions of the parties, and noted that it revealed that Sara did not deliver Caroline to her father, as she was directed to do by the trial court's order on July 27, 2000, even though she had the ability to do so. Based on this finding and others, it concluded that an order of "contempt, warranted by bad faith, should be entered for [Sara's] refusal or failure to comply with the terms of the court's order of July 27, 2000." CP at 66. We believe that this conclusion was justified and that it is supportive of the contempt order entered by the trial court pursuant to RCW 26.09.160(2)(b).

According to the parenting plan that was approved by the superior court at the time the Rideouts' marriage was dissolved, Christopher was entitled to four weeks of residential time with Caroline every summer. The record shows that during the summers of both 1998 and 1999, Christopher did not obtain the time with Caroline that he was entitled to pursuant to the parenting plan. In the summer of 2000, as we have observed, Sara failed to make reasonable attempts to comply with the residential time provisions of the parenting plan, as she began to communicate through her actions and words that the issue of Caroline's summer residential time with her father was between Caroline and Christopher. Although Caroline may not have wanted to visit her father on July 27, 2000, and on other occasions, Sara made no attempt to overcome the child's intransigence or to deliver her to Christopher's house on July 27, 2000, as she was ordered to do.

In light of the events of July 27, 2000, and those leading up to that unfortunate incident, which are summarized very succinctly in the trial court's findings of fact, we find ourselves in agreement with the trial court and the Court of Appeals that Sara not only contributed to Caroline's resistance to residential time with her father, but failed to make

reasonable efforts to require Caroline to visit Christopher as required by the parenting plan and the trial court's order for residential time.

In reaching the decision it did, the trial court noted a pattern of behavior by Sara that demonstrated an unwillingness on her part to assume responsibility for making reasonable efforts to comply with the provisions of the orders establishing residential time for Christopher. Although Sara portrayed herself as a powerless bystander without the ability to require Caroline to visit her father in accordance with the parenting plan and orders of the court, we agree with the trial court and the Court of Appeals that by doing so she sidestepped her responsibilities as a parent. There are no doubt numerous instances where a child may not want to visit with his or her parent in accordance with a parenting plan or pursuant to a specific order of the court. Whether they like it or not, parents, like Sara, have an obligation to attempt to overcome the child's resistance to the residential time in order to ensure that a child's residential time with the other parent takes place. Sara had that responsibility and failed to meet it by not assuring that Caroline visited with her father in accordance with the parenting plan and the subsequent order of the trial court. In other words, she was obligated to make good faith efforts to require Caroline to do so. *See* RCW 26.09.160(1). The trial court concluded that she did not measure up to this standard and, in our view, that determination was justified. The trial court's determination was sensible and based on an acknowledgment that, while a parent should not be punished for the actions of a truly recalcitrant child, punishment is appropriate when the parent is the source of the child's attitude or fails to overcome the child's recalcitrance when, considering the child's age and maturity, it is within that parent's power to do so.

In sum, we hold that where a child resists court-ordered residential time and where the evidence establishes that a parent either contributes to the child's attitude or fails to

make reasonable efforts to require the child to comply with the parenting plan and a court-ordered residential time, such parent may be deemed to have acted in "bad faith" for purposes of RCW 26.09.160(1). We therefore affirm the Court of Appeals decision upholding the contempt order entered by the superior court against Sara.

## IV. Attorney Fees

### A. Awarded by Court of Appeals

Sara contends that the Court of Appeals erred when it awarded attorney fees to Christopher pursuant to RCW 26.09.140, based on its determination that he was entitled to such fees as "the prevailing party on appeal." *Rideout*, 110 Wn. App. at 382. In support of her contention, Sara argues that RCW 26.09.140 "permits awards of appellate fees based on need and ability to pay" and that "RCW 26.09.140 has nothing to do with prevailing parties." Suppl. Br. of Pet'r at 16.

RCW 26.09.140 provides in relevant part that:

The court from time to time after considering the financial resources of both parties may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this chapter and for reasonable attorney's fees or other professional fees in connection therewith . . . .

Upon any appeal, *the appellate court may, in its discretion,* order a party to pay for the cost to the other party of maintaining the appeal and attorney's fees in addition to statutory costs.

(Emphasis added.) We agree with Sara. The aforementioned statute does not support an award of attorney fees to a party simply on the basis that they are "prevailing." Although the statute does invest appellate courts with discretion to order a party to pay fees and costs to the opposing party, that provision must be read in light of the fact that the statute ties the award of fees to a consideration of financial circumstances. Here, there is no indication that

the relative financial circumstances of the parties were a consideration in the award of fees to Christopher. It was, therefore, error for the court to award attorney fees to Christopher pursuant to RCW 26.09.140.

However, Christopher also sought fees at the Court of Appeals under RCW 26.09.160. Concluding that an award of fees was appropriate under RCW 26.09.140, the Court of Appeals made no mention of Christopher's request under RCW 26.09.160. *Rideout*, 110 Wn. App. at 382. On appeal, "[w]e may affirm the [lower] court on any grounds established by the pleadings and supported by the record." *Truck Ins. Exch. v. VanPort Homes, Inc.*, 147 Wn.2d 751, 766, 58 P.3d 276 (2002). Indeed, a reviewing court can sustain a grant of attorney fees under a different statute than the one relied upon by the lower court. *State ex rel. A.N.C. v. Grenley*, 91 Wn. App. 919, 927-28, 959 P.2d 1130, *review denied*, 136 Wn.2d 1031, 972 P.2d 467 (1998).

RCW 26.09.160(1) provides as follows:

> An attempt by a parent . . . to refuse to perform the duties provided in the parenting plan, . . . shall be deemed bad faith and shall be punished by the court by holding the party in contempt of court and by *awarding to the aggrieved party reasonable attorneys' fees and costs incidental in bringing a motion for contempt of court.*

(Emphasis added.) In addition, RCW 26.09.160(2)(b)(ii) provides:

> (b) If, based on all the facts and circumstances, the court finds after hearing that the parent, in bad faith, *has not complied with the order establishing residential provisions for the child*, the court shall find the parent in contempt of court. Upon a finding of contempt, the court shall order:
>
> . . . .
>
> (ii) The parent to pay, to the moving party, *all court costs and reasonable attorneys' fees incurred as a result of the noncompliance*, and any reasonable expenses incurred in locating or returning a child . . . .

(Emphasis added.) These statutes have application to these circumstances. We say that because all of the proceedings before the Court of Appeals focused on Sara's noncompliance with the residential provisions of the parenting plan relating to the Rideouts' children. Although the statutes do not speak directly to attorney fees on appeal, we agree with the reasoning of the Court of Appeals in *In re Parentage of Schroeder*, 106 Wn. App. 343, 353-54, 22 P.3d 1280 (2001), that a party is entitled to an award of attorney fees on appeal to the extent the fees relate to the issue of contempt.

As we have observed above, Sara acted in bad faith in not complying with the court order establishing residential provisions for Caroline. She must, therefore, pay Christopher's attorney fees and costs for his appeal to the Court of Appeals, in accordance with RCW 26.09.160(1), (2)(b)(ii).

## B. For Proceedings in this Court

Christopher and Sara each ask this court to grant them reasonable attorney fees and costs for the proceedings before this court. As he did at the Court of Appeals, Christopher bases his claim for fees on the provisions of RCW 26.09.140 and RCW 26.09.160. Sara rejects Christopher's claim for an award of fees and requests that she be awarded fees pursuant to RCW 26.09.140, asserting that she is "unable to pay her appellate attorney fees." Suppl. Br. of Pet'r at 18-19.

Due to Sara's bad faith in complying with the parenting plan, she must also pay Christopher's attorney fees and costs for his appeal to this court, in accordance with RCW 26.09.160(1), (2)(b)(ii). In light of that conclusion, we deny Sara's request for attorney fees.

## V. Conclusion

In sum, we affirm the Court of Appeals holding that, notwithstanding the fact that the record was entirely documentary, the superior court's findings should be given

deference and evaluated to determine if there was substantial evidence to support them. We also affirm the Court of Appeals in holding that a parent may be held in contempt, pursuant to RCW 26.09.160, for failing to make reasonable efforts to require a child to visit the other parent as required by a parenting plan and court order establishing residential time. We affirm, on different grounds, the Court of Appeals decision to the extent that it awarded attorney fees to Christopher for the appeal to that court. We also award attorney fees and costs to Christopher for the proceedings in this court. We deny Sara's request for fees.

JOHNSON, MADSEN, SANDERS, IRELAND, BRIDGE, CHAMBERS, OWENS, and FAIRHURST, JJ., concur.