IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| ERIKA EVANS, | ) | No. 79948-7-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| STEVEN B. BAUMGARTEN | ) | UNPUBLISHED OPINION |
| DOB 06/25/1960, | ) | |
| | ) | |
| Appellant. | ) | |

BOWMAN, J. — Erika Evans obtained a stalking protection order against Steven B. Baumgarten. Baumgarten argues the court lacked sufficient evidence to find he engaged in repeated acts of harassment. Because Baumgarten's behavior constitutes stalking under RCW 7.92.020(3)(c),[1] we affirm.

## FACTS

Evans is an assistant city attorney in the Seattle City Attorney's Office. She is one of three city attorneys who entered notices of appearance in a lawsuit filed by Baumgarten. On February 22, 2019, Evans filed a petition for a stalking protection order against Baumgarten. "[T]hree recent events" led her to fear that

---

[1] We note the legislature amended RCW 7.92.020 in 2020 to add a definition of "electronic monitoring" and renumbered the subsections. LAWS OF 2020, ch. 296, § 4. The definition of "stalking conduct" as defined in former RCW 7.92.030(3) (2013) did not change but was renumbered as subsection (4). See RCW 7.92.030. We cite to former RCW 7.92.020(3) throughout the opinion.

Citations and pin cites are based on the Westlaw online version of the cited material.

she was being "harassed and stalked." Two events occurred on January 31, 2019 and one event occurred on February 19, 2019.

Toward the end of the workday on January 31, 2019, Baumgarten went to the Seattle City Attorney's Office. Baumgarten asked receptionist Lisa Levias if Evans worked there. Levias confirmed that she did. According to Levias, Baumgarten asked for Evans "at least two more times" during their conversation. Baumgarten also repeatedly asked if Levias and her coworker "were talking about him." Levias informed Baumgarten that the office was about to close for the day and asked him to leave.

On her way out of the office, Levias discovered Baumgarten waiting in the elevator. Evans then entered the elevator on a lower floor. Because of Baumgarten's "erratic" and "paranoid" behavior in the office, Levias was careful not to identify or speak to Evans in the elevator. After exiting the elevator in the lobby, Baumgarten again asked Levias "in a loud voice" if she and her coworkers had talked about him. Levias "tried to reassure him that he wasn't being talked about" and left the lobby area.

Evans noticed that Levias was "acting odd and not making eye contact with her" on the elevator. She then saw Levias speaking with Baumgarten in the lobby. After Levias walked away from Baumgarten, she rejoined Evans at the escalator. Levias told Evans that Baumgarten had come to the office looking for her. She also told Evans that Baumgarten had been "extremely persistent" and showed "signs of paranoia." Levias and Evans then left the building and parted ways.

Evans walked to the bus stop and waited about 15 minutes for a bus. On the bus, she found a "seat that faces inward." Soon after she found her seat, Evans was "shocked" to find Baumgarten "standing over" her. She described him as standing "right in front of me, facing directly in front of me." In the crowded bus, Evans had nowhere to go. Baumgarten "aggressively peppered" Evans with questions for almost 15 minutes, such as:

> "You are a City Attorney[.]" "You were just in the elevator!" "You work at the City Attorney's Office!" [and] "Were you and that lady talking about me!?"

Evans claimed not to know what Baumgarten was talking about. He became increasingly agitated and continued to hover over Evans, asking questions. She was scared so she texted her fiancé, who worked nearby. Baumgarten accused her of calling the police "or trying to tell on him." Because she felt "intimidated and threatened," Evans abruptly exited the bus at the next stop. She spotted a police officer nearby and stood near him until her fiancé arrived.

On February 19, 2019, Baumgarten returned to the Seattle City Attorney's Office. Baumgarten asked Levias if she remembered being on the elevator with " 'that girl.' " Levias said she remembered him. Baumgarten asked if they "had been talking about him." Once again, Levias assured Baumgarten they had not been talking about him. Baumgarten then asked which floors housed the attorneys' offices. Levias became concerned Baumgarten was attempting to locate Evans. Levias saw Evans' supervisor near the reception area and notified her that Baumgarten was in the lobby. Levias explained her concerns to the

supervisor, who went to find Evans. Evans was in her office when her supervisor rushed in and told her "not to leave the building." She explained that Baumgarten was in the reception area asking for the location of the lawyers' offices. Evans feared for her safety, suspecting that Baumgarten had come back looking for her.

On February 22, 2019, the court issued a temporary stalking protection order. On March 5, 2019, the court held a hearing to determine whether a permanent order should issue. Baumgarten filed a declaration and appeared pro se at that hearing. He explained that he suffers from "schizo-effective and obsessive compulsive" disorder that manifests as an "obsessive need to analyze details with people." According to Baumgarten, this obsessive need to ask questions and analyze details led to a misunderstanding with Evans. Baumgarten calls these "analysis questions." He told the court, "Once those analysis questions enter my mind, they do not go away until I get them answered." Baumgarten testified, "It's never my intention to cause anyone fear."

Baumgarten stated that he went to the Seattle City Attorney's Office on January 31, 2019 to serve papers for his lawsuit. After serving the papers, Baumgarten had "an analysis question" for Levias. He wondered whether Levias and another receptionist were talking about him. When Baumgarten saw Levias on the elevator, he started asking her detailed questions on the subject.

Baumgarten said he saw Levias speaking with another woman, whom he later learned was Evans, after exiting the elevator. He had never seen Evans so

he did not recognize her on the elevator. At that point, Baumgarten left the building to catch a bus to play basketball with a friend.

On the bus, Baumgarten recognized Evans as the woman speaking with Levias outside of the elevator. He did not know her name, where she worked, or that she was an attorney. Finding himself standing near her on the bus, Baumgarten began asking Evans "analysis questions." He wanted to know if she had been talking about him with Levias. Baumgarten noticed that Evans felt "uncomfortable." She got off the bus and Baumgarten continued on to the park to play basketball with his friend.

Baumgarten claimed that on February 19, 2019, he went to the Seattle City Attorney's Office again to deliver papers. He asked Levias if she had talked about him with "the other lady." Baumgarten asserted he was not stalking Evans and "[u]ntil I got served with the papers for this hearing, I had no idea who she was, or what she looked like." Baumgarten told the court he was "sorry that she felt fear."

Baumgarten called two witnesses. His housekeeper testified that Baumgarten asks questions "over and over again" and has "difficulty letting go" of situations. She said that people who do not know Baumgarten often "misunderstand" the questioning as harassment. She explained that people mistakenly think Baumgarten is dangerous but he is not. Baumgarten's friend, the same man he met on January 31, 2019 to play basketball, testified similarly. He described Baumgarten as "the most annoying man I have ever met in my life" but "he's not a dangerous person."

5

After considering the testimony, the trial court issued a permanent stalking protection order in effect until March 5, 2060. Baumgarten appeals.

ANALYSIS

Baumgarten alleges the court abused its discretion by granting the protection order because substantial evidence does not support that he engaged in stalking behavior. Specifically, he argues that Evans fails to satisfy the elements of RCW 9A.46.110, the criminal stalking statute, because the evidence does not support two or more distinct incidents of harassment. See RCW 9A.46.110(1)(a), (6)(e).

We review a trial court's decision to grant or deny a protection order for abuse of discretion. In re Marriage of Freeman, 169 Wn.2d 664, 670-71, 239 P.3d 557 (2010). Where the court held a hearing and weighed evidence, we assess whether substantial evidence supports the court's decision. In re Marriage of Rideout, 150 Wn.2d 337, 351, 77 P.3d 1174 (2003); see Kencayd v. Priece, No. 74665-1-I, slip op. at 3-4 (Wash. Ct. App. Nov. 28, 2016) (unpublished), http://www.courts.wa.gov/opinions/pdf/746651.pdf.[2] "Substantial evidence is evidence in sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." In re Welfare of T.B., 150 Wn. App. 599, 607, 209 P.3d 497 (2009).

A court must grant a stalking protection order if it "finds by a preponderance of the evidence that the petitioner has been a victim of stalking

---

[2] "Washington appellate courts should not, unless necessary for a reasoned decision, cite or discuss unpublished opinions in their opinions." GR 14.1(c). "However, unpublished opinions of the Court of Appeals filed on or after March 1, 2013, may be cited as nonbinding authorities, if identified as such by the citing party, and may be accorded such persuasive value as the court deems appropriate." GR 14.1(a).

conduct by the respondent." RCW 7.92.100(1)(a). "Stalking conduct" is defined

as "any of the following":

>    (a) Any act of stalking as defined under RCW 9A.46.110;
>    (b) Any act of cyberstalking as defined under RCW
> 9.61.260;
>    (c) Any course of conduct involving repeated or continuing
> contacts, attempts to contact, monitoring, tracking, keeping under
> observation, or following of another that:
>    (i) Would cause a reasonable person to feel intimidated,
> frightened, or threatened and that actually causes such a feeling;
>    (ii) Serves no lawful purpose; and
>    (iii) The stalker knows or reasonably should know threatens,
> frightens, or intimidates the person, even if the stalker did not
> intend to intimidate, frighten, or threaten the person.

RCW 7.92.020(3).

Baumgarten contends that Evans did not produce sufficient evidence that

he engaged in stalking conduct. He argues that a finding of stalking requires at

least "two distinct" harassing acts and that Evans can show only one—his

interaction with her on the bus.

In support of his argument, Baumgarten cites City of Seattle v. Meah, 165

Wn. App. 453, 267 P.3d 536, 297 P.3d 69 (2011). Meah involved a prosecution

for stalking under former Seattle Municipal Code (SMC) 12A.06.035 (2008). 165

Wn. App. at 454.[3] The defendant argued that his conduct was one continuous

act that did not satisfy the statutory requirement of repeated harassment. Meah,

165 Wn. App. at 457. Quoting State v. Kintz, 169 Wn.2d 537, 551, 238 P.3d 470

(2010), we concluded that "[i]n order to properly convict a person of stalking, a

---

[3] Both RCW 9A.46.110(1)(a) and former SMC 12A.06.035(A)(1) require that a person intentionally and "repeatedly" harass or follow another person in order to commit stalking. Both the statute and the ordinance define "repeatedly" as "on two or more separate occasions." RCW 9A.46.110(6)(e); see former SMC 12A.06.035(E)(3).

jury must find two or more 'distinct, individual, noncontinuous occurrences or incidents' of following or harassment." Meah, 165 Wn. App. at 454.

But Baumgarten is not charged with criminal stalking under RCW 9A.46.110. He is the respondent in a civil petition for an order of protection from stalking conduct "pursuant to RCW Title 7.92." Under RCW 7.92.020(3)(a), meeting the elements of criminal stalking in RCW 9A.46.110 is only one of three alternative means to demonstrate stalking conduct. Here, the trial court specifically found that Baumgarten's conduct amounted to stalking under RCW 7.92.020(3)(c).

The record supports the trial court's conclusion that Baumgarten engaged in a "course of conduct involving repeated . . . attempts to contact" Evans in violation of RCW 7.92.020(3)(c). On January 31, Baumgarten went to the Seattle City Attorney's Office and asked whether Evans worked there. During the ensuing conversation, he asked about Evans at least two more times. Later that afternoon, Baumgarten had direct contact with Evans on the bus and "continued to harass" her for approximately 15 minutes about seeing her in the elevator earlier. And on February 19, Baumgarten returned to the Seattle City Attorney's Office and asked Levias if she and Evans had been talking about him. He then asked on which floors the attorneys' offices were located. Levias believed Baumgarten was attempting to locate Evans and notified Evans' supervisor. These three acts show a course of conduct that supports a finding of stalking conduct.

There is also sufficient evidence that Baumgarten's actions would cause a "reasonable person to feel intimidated, frightened, or threatened." RCW 7.92.020(3)(c)(i). Levias described Baumgarten's demeanor as "a little erratic/paranoid." Evans testified that on the bus, Baumgarten appeared "manic, deranged, angry, and paranoid." She said that his behavior caused her to feel frightened and threatened. In fact, his behavior caused her to seek out a police officer for protection. When Baumgarten returned to her office on February 19, she became afraid that Baumgarten would be waiting for her in the lobby of the building or on the bus that day as well as in the future, "and that made me fear for my safety and my life."

The record shows that Baumgarten's conduct served "no lawful purpose." RCW 7.92.020(3)(c)(ii). He claims that he went to the Seattle City Attorney's Office to deliver legal papers related to the lawsuit that lists Evans as an attorney. However, Baumgarten had no reason to ask about Evans. Evans' involvement in his case was nominal. She was one of three attorneys to file a notice of appearance. She did not sign or file any documents associated with the case. Yet Baumgarten inquired about only Evans.

Finally, there is substantial evidence that Baumgarten knew or should have known that his conduct would "intimidate, frighten, or threaten" Evans "even if" he "did not intend to" do so. RCW 7.92.020(3)(c)(iii). Baumgarten testified that he has an "obsessive need" to get his "analysis questions . . . answered." Baumgarten admitted that when he confronted Evans on the bus, he "could tell she was uncomfortable." And he elicited testimony from both of his witnesses

that people often mistake his incessant questioning for dangerous behavior or harassment.

We conclude that substantial evidence supports the trial court's issuance of the stalking protection order, and affirm.

_Bramm, J_

WE CONCUR:

_Smith, J._                    _Appelwick, J._