IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| MAISIE QIAOMEI CHEN, | No. 86541-2-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| HUNG DUY LE aka ANDREW LE, | |
| Appellant. | |

HAZELRIGG, C.J. — Andrew Le appeals from the domestic violence protection order entered by a superior court judge protecting Maisie Chen and their two children from Le's coercive control. On appeal, Le asserts that substantial evidence does not support the commissioner's finding that he engaged in coercive control. Because the undisputed record in this matter reflects that Le's actions constituted conduct used to cause another person to suffer psychological or emotional harm and such actions unreasonably interfered with Chen's free will and personal liberty, we disagree and affirm.

FACTS[1]

Le and Chen began a romantic relationship in 2015. They never married. Beginning in 2019, they lived together in a house in Lynnwood. Between 2019

---

[1] The following facts are either undisputed by both parties or, in light of the applicable standard of review on appeal, are reasonable inferences taken from these undisputed facts in Chen's favor as the prevailing party in the trial court. *Korst v. McMahon*, 136 Wn. App. 202, 206, 148 P.3d 1081 (2006).

and 2021, Chen gave birth to two girls, each via donor embryos obtained from a fertility clinic. Chen was the primary caretaker of their children. Notably, while they were living together in Lynnwood, Chen had a job and Le provided her with an entry key to that house.

In June 2022, Le decided that Chen and their children would move to his house in Stanwood. At this time, their youngest daughter was less than 1 year old and their oldest was no more than 3 years old. After Chen and their children moved in, Le retained his own entry key but he did not provide one to Chen. Le later stated that "there was not a need for her to have a key at that time," because he typically worked from home, "she didn't have a job at the time," and they "would go out together as a family."[2] Le, for his part, did not tell Chen on which days he was scheduled to work from home and acknowledged that he was sometimes called in to the office without advance notice. Chen stayed at home to take care of their children and manage the household, including buying groceries and items for the children.

Sometime after they moved into the Stanwood house Le installed security cameras in the living room, home office, and basement in order to, according to him, watch for mice and for use as a "nanny cam, [him] watching [his] babies." At one point, he also unilaterally "decided to turn off their [home] internet" in order to limit their children's screen time, which also deprived Chen of home internet access. In addition, he "would store things and keep [his] valuables" in the house's locked basement, to which he did not provide Chen access.

_____

[2] Le later conceded, "It is true that Ms. Chen should have a key" and "now I see it would have been a good idea" to have made extra keys.

Later on, Chen obtained a job and requested that Le make her a copy of the house key. Unlike when he provided her a key to the Lynnwood house, Le instead attempted to bargain with Chen, telling her that "if she would give [him] me her car key, [he] would give her the house key," because, according to Le, "it would only be fair that [he] should be able to borrow her car periodically."[3] Chen declined to make him a copy of her car key.

Additionally, Le explained, "I did not see a pressing need to make extra keys (and when we went out as a family, say for a road trip or misc. errands, I drove my car with all of us in it and we all returned to the house together)." Le later acknowledged, "I never got around to making a key."[4]

In addition, on one evening during the time in question, Chen returned to the Stanwood house with their children but could not gain entry into the house because the front door was locked, she did not have an entry key, and Le was unavailable. She and the children were able to enter the house several hours later with Le's assistance upon his arrival. On another evening, Chen and Le had an argument and Le refused to let her into the house. He told her to stay somewhere else that night and she did.

By late 2023 or early 2024, Chen and Le had an argument that resulted in Chen saying to Le that if he kicked her out of the house, she would have nowhere else to go. Le responded, "In February, if you're not out, you'll see." In the last week of February, Chen noticed that Le had taken some of their children's clothing

---

[3] During the time in question, Chen had a car of her own and Le also had at least one car of his own.

[4] He later stated that his failure to make her a copy of the house key "wasn't to control her; it was an oversight by a busy person."

and locked it away so that she would not have access to it. Also around this time, Chen noticed that Le had brought home a car steering wheel lock.

Shortly thereafter, on February 28, Chen left the Stanwood residence and took their two children with her. The next day, Chen filed a petition for a domestic violence protection order against Le, seeking to protect herself and her children from him. She included a sworn declaration in support of her petition alleging the facts as set forth herein, as well as other incidents of controlling and threatening conduct and statements by Le during the time in question. She stated that as a result of his conduct and statements, she felt that, among other things, she could not come and go from the house without his permission, he was surveilling her, she did not have access to certain rooms in the house, and he was preventing her from fleeing with their children.

Le responded with his own sworn declaration, alleging alternative facts, conceding the foregoing facts, declining to dispute them, denying that certain other incidents alleged by Chen occurred, and otherwise denying that he threatened or controlled Chen by his actions.

In March 2024, following a hearing on the parties' pleadings and supporting materials, the court found that "there is a pattern of behavior that was conducted by [Le] upon [Chen] that would satisfy the statutory definition of coercive control," and "the burden of proof ha[d] been met" by Chen. The commissioner granted her petition and entered a domestic violence protection order against Le. In so doing, the court indicated that Le's coercive control over Chen was "the primary basis and factor for the issuance of this protection order."

Le timely appealed.

ANALYSIS

I.      Substantial Evidence

Le asserts that substantial evidence does not support the commissioner's determination that he engaged in coercive control over Chen. We disagree.

In considering such a challenge on appeal, we recently stated as follows:

> When an appellant contends that findings of fact do not support the trial court's conclusions, we limit our review to determining whether substantial evidence supports the findings and, if so, whether those findings support the conclusions of law. *Nguyen v. City of Seattle*, 179 Wn. App. 155, 317 P.3d 518 (2014). "Substantial evidence" is evidence sufficient to persuade a fair-minded, rational person that the finding is true. *In re Estate of Langeland*, 177 Wn. App. 315, 320, 312 P.3d 657 (2013).

*Graser v. Olsen*, 28 Wn. App. 2d 933, 941-42, 542 P.3d 1013 (2023). In "[a]pplying this deferential standard, we view all reasonable inferences from the evidence in the light most favorable to the prevailing party." *Korst v. McMahon*, 136 Wn. App. 202, 206, 148 P.3d 1081 (2006). In so doing, we may affirm a trial court's determination on any basis supported by the record. *In re Marriage of Rideout,* 150 Wn.2d 337, 358, 77 P.3d 1174 (2003).

Here, the commissioner determined that Chen had carried her burden of proof to establish that Le had engaged in domestic violence in the form of coercive control. RCW 7.105.010(9)(a) defines "[d]omestic violence" for the purpose of a protection order as

> [p]hysical harm, bodily injury, assault, or the infliction of fear of physical harm, bodily injury, or assault; nonconsensual sexual conduct or nonconsensual sexual penetration; *coercive control*;

unlawful harassment; or stalking of one intimate partner by another intimate partner.

(Emphasis added.)

RCW 7.105.010(4)(a), in turn, defines "[c]oercive control" as "a pattern of behavior that is used to cause another to suffer physical, emotional, or psychological harm, and in purpose or effect unreasonably interferes with a person's free will and personal liberty." This statute further provides that, "[i]n determining whether the interference is unreasonable, the court shall consider the context and impact of the pattern of behavior from the perspective of a similarly situated person." RCW 7.105.010(4)(a); *see also Graser*, 28 Wn. App. 2d at 941-42.

We conclude that sufficient evidence supports the commissioner's determination that Le exercised coercive control over Chen during the time in question. First, the undisputed record reflects that Le's actions toward Chen constitute conduct that is used to cause another to suffer emotional or psychological harm. Indeed, as previously explained, when Chen moved into Le's Stanwood house as her primary residence, Le did not provide her an entry key to that house, rejected her request for such a key, placed and monitored the video recordings of security cameras inside of the house, including in the living room, did not keep her apprised of his work schedule, did not provide her access to the basement of their shared residence, unilaterally turned off the home internet connection, and locked their children's clothing away from her. Given all of that, Le's actions toward Chen were constraining and controlling. It logically follows that being so constrained and controlled would result in either

emotional or psychological harm to the person subject to such conduct. Therefore, the foregoing actions by Le constitute conduct that is used to cause another person to suffer emotional or psychological harm. RCW 7.105.010(4)(a).

Second, the undisputed record before the commissioner supports their conclusion that Le's conduct, in effect, constituted an unreasonable interference with Chen's free will and personal liberty. Notably, by not providing her with an entry key to her primary residence, by not providing her with clear information about his work schedule, and by relying on her for primary childcare and household responsibilities, he significantly limited her ability to come and go from her primary residence. Indeed, it is reasonable to infer that someone in Chen's situation, a mother caring for two young children and managing a household without a key to the home, would be significantly constrained in the range of decisions available to her on any given day. If she needed to leave the house, for example, she could presumably either lock the door behind her and hope that Le returned before her to unlock the door or, in the alternative, she could leave the door unlocked and risk the safety of her home and her family's possessions.

Moreover, the undisputed record in this matter contains two instances in which Chen not having a key to the Stanwood house significantly limited her: on one occasion, Le did not allow Chen to enter the house and she had to find another place to stay for the night, and on another occasion, Chen arrived home late one night with the children and could not enter the locked house until Le

later arrived to let them in. Given that, the context and impact of Chen's pattern of behavior from the perspective of a similarly situated person—here, a mother and primary caretaker of two young children partnered with an individual who is controlling and domineering—further reinforces that Le's conduct constitutes an unreasonable interference as set forth in RCW 7.105.010(4)(a).

Taken together, the foregoing amply supports the commissioner's determination that Le engaged in a pattern of behavior used to cause Chen to suffer emotional or psychological harm that, in effect, unreasonably interfered with her free will and personal liberty. Thus, substantial evidence supports the commissioner's determination that Le engaged in domestic violence against Chen in the form of coercive control. Accordingly, Le's contention fails.[5]

II.     Attorney Fees

Chen requests an award of attorney fees on appeal pursuant to RAP 18.9(a) and RCW 7.105.310(1)(j). However, apart from dedicating a section of her briefing to a cursory recitation of this authority, Chen does not present any

---

[5] Le nevertheless asserts that substantial evidence does not support the commissioner's determination because they did not make a specific finding that Chen was more credible than Le. However, as discussed herein, we can affirm this matter based on the undisputed record presented to the commissioner and reasonable inferences therefrom. *Korst*, 136 Wn. App. at 206.

Le also contends that substantial evidence does not support the commissioner's determination because, according to Le, that determination was based solely on the commissioner's finding that Le and Chen had a "past dysfunctional relationship" and there are "power dynamics" between the parties. Although Le correctly points out that commissioner's reasoning in this matter is sparse, we may affirm the commissioner's decision as supported by substantive evidence based on any evidence in the record before the court. *Rideout,* 150 Wn.2d at 358. As explained herein, the record contains such a quantum of evidence. Accordingly, Le has failed to demonstrate entitlement to relief on this basis.

analysis or meaningful citation to the record applying this authority to the matter before us.[6]  Therefore, we deny her request.

Affirmed.

WE CONCUR:

_____

_____     _____
Birk, J.                    Cheung, J.

---

[6] Furthermore, the record reflects (and Chen does not dispute) that the commissioner did not grant her request for an award of attorney fees presented in her petition in the trial court.