IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| DONNA CHARBONNEAU on behalf of OLIVIA CHARBONNEAU, | ) ) ) | No. 67922-8-I |
| Respondents/Cross Appellants, | ) ) | DIVISION ONE |
| v. | ) ) | UNPUBLISHED OPINION |
| TANNER FOSTER, | ) ) ) | |
| Appellant/Cross Respondent. | ) | FILED: June 10, 2013 |

SCHINDLER, J. — A superior court commissioner denied a petition for a sexual

assault protection order. On revision, the superior court reversed and entered a sexual

assault protection order. Tanner Foster contends that on revision, the superior court

erred in (1) reviewing the record de novo and (2) relying on RCW 7.90.090(4), the

statutory requirement that prohibits denial of a protection order based on voluntary

intoxication. In the alternative, Foster claims de novo review on revision violates due

process and RCW 7.90.090(4) is unconstitutionally vague. Donna Charbonneau cross

appeals denial of her motion to seal, redact, or strike the declaration of a Whatcom

County deputy under the Criminal Records Privacy Act, chapter 10.97 RCW. We affirm

the decision on revision but remand to redact the name of the juvenile sexual assault

victim from the declaration.

FACTS

On July 13, 2011, 16-year-old Tanner Foster asked 15-year-old Olivia Charbonneau to "walk to the pier with him and his friend John Martinez."[1] Afterwards, Foster contacted her several more times. Charbonneau said that Foster acted "increasingly more flirty" but she "passed it off as friendliness, because he had a serious girlfriend and I was not interested in being more than friends with him, I was friendly, but I did not flirt back."

On Saturday July 16, Foster sent Charbonneau a text message asking her if she wanted to get together "to drink with him and [Martinez] later." Charbonneau got together with Foster and Martinez at about 6:00 p.m., and "did a couple of shots in the car" before leaving to meet her friends. Later, Charbonneau received several text messages from Foster "asking if I would finish the bottle with him and probably [Martinez] the next day."

The next day, Foster picked up Charbonneau from church at approximately 10:00 a.m. and drove to his house. Foster's parents were not home. Charbonneau said that after they arrived at the house, she and Foster drank the rest of the liquor from the night before and a bottle of beer. Foster then opened a bottle of white wine. Charbonneau said that Foster forced her to drink the wine and the "[n]ext thing I knew it I was on the floor, I can only remember flashes, but I remember that what he was doing was painful and that I was crying. I also remember telling him 'no.' "

Foster dropped Charbonneau off at her friend Dustin Effinger's house at approximately 4:00 p.m. Charbonneau told Dustin and his older sister Kaleigh that

---

[1] We note that Olivia Charbonneau's name is used in the caption in the superior court and on appeal. We further note that Olivia Charbonneau's name is referred to throughout the record and in the briefs on appeal.

Foster had raped her.[2]  Later that night, Charbonneau told her friend Emmy Johnson that Foster had raped her.

Whatcom County Deputy Sherriff Colin Bertrand interviewed Charbonneau and Foster.  Foster told Deputy Bertrand that he had sex with Charbonneau but it was consensual.

On August 17, Donna Charbonneau filed a petition on behalf of her daughter for issuance of a sexual assault protection order.  Olivia submitted a declaration in support of the sexual assault protection order stating that on July 17, Foster forced her to have sex three times.[3]  Olivia says that she told Foster "no multiple times and to stop and that it hurt" but "he kept going."

> After [the liquor and beer] he got a bottle of white wine, I didn't want to drink that, but he basically forced it on me.  After that I remember sobbing to him about my then-boyfriend Eddie.  Next thing I knew it I was on the floor, I can only remember flashes, but I remember that what he was doing was painful and that I was crying.  I also remember telling him "no".  The next part that I remember happening was him carrying me out to the hot tub.  After being in there for a couple minutes, he carried me back inside. I then remember throwing up due to all the alcohol.  Then I remember being on the floor again.  I remember him pulling what I thought was a condom out of him [sic] pocket, then I blacked out.

Olivia also states that after she "blacked out[,] . . . [t]he next memory I have was going out to the car to pick up [Martinez] at his house.  Since I didn't want any more bad things to happen, I decided to act as if nothing was wrong, so I could get home safely." Olivia said that she was still drunk when Foster dropped her off at approximately 4:00 p.m.

---

[2] We refer to Dustin and Kaleigh Effinger by their first names for purposes of clarity and mean no disrespect by doing so.

[3] We refer to Olivia Charbonneau and her mother Donna Charbonneau by their first names for purposes of clarity and mean no disrespect by doing so.

Olivia recalled telling Kaleigh and Dustin Effinger that Foster had raped her, and telling Emmy Johnson later that night that Foster had raped her. Olivia also said that Foster sent her a text message that night asking her if she "had any regrets." According to Olivia, Foster's girlfriend told her that Foster said they had sex three times.

> I told [Foster's girlfriend] everything, and she told me what he had said. I only remember being sexually assaulted twice. She told me he said we hooked up three times, I thought that it could very well have been three times, because I couldn't remember hours of that day. The point is, before I went to his house, I had no interest in having sex with him, and afterward I felt like I had been taken advantage of, and sexually assaulted by him.
> I am not the type of girl to just have sex with anyone. Prior to this incident I had only had sex once, in a relationship.

Donna Charbonneau, Emmy Johnson, Christopher Poole, and Kaleigh and Dustin Effinger also submitted declarations in support of the petition for a sexual assault protection order.

Poole states that he and Olivia exchanged text messages on July 17 and that over the course of the day, her text messages became "gibberish." When he called Olivia to check on her, Poole said that she "sounded drunk [and] when [Foster] came back though, she immediately hung up without another word." Poole states that when he called back later, Olivia "sounded very upset saying she just wanted to go home."

Dustin Effinger states that he also called Olivia while she was with Foster on July 17. Dustin said her responses "were timid and sporadic, and it was obvious she'd been drinking." Dustin states that Olivia was "crying hysterically" and "looked as though she had endured a serious physical toll." Kaleigh Effinger also states that when Olivia arrived at their house, she was crying and eventually told her that Foster raped her. Dustin states that Olivia later told him that Foster had raped her and she "has never

4

once lied to me, and I know her well enough to know that she, under no circumstance, would lie about something so serious."

Poole states that when he arrived at the Effingers' house, Olivia was "crying saying she'd been raped. She told us she didn't remember much more than him practically pouring drinks down her throat, forced himself on her, she told him no, and that there was pain."

In her declaration, Emmy Johnson states that Olivia sent her a text message at around 5:30 p.m. telling Johnson that Foster had raped her.

> While on shift, at about 5:30, I got a text message from Olivia saying "I think I got raped." I freaked out and called [Poole] and Dustin, and Dustin said that Olivia had come to their house crying and went to talk to his older sister Kaleigh. Then she went home. So I called Olivia at about 9:30 and asked her what happened and she told me he ([Foster]) had gotten her drunk and then raped her, and that she couldn't remember a lot, but that she remembered saying "no" and that "it hurt."

Donna Charbonneau states that after her daughter returned home that evening, she looked like "a complete mess" and had been crying. Donna also states that she provided Deputy Bertrand with phone records showing the number of times Foster contacted Olivia before July 17. According to Donna, Deputy Bertrand told her that "he was an experienced drug investigator but NOT experienced with investigating rape." Donna also states that Deputy Bertrand interviewed her daughter on two separate occasions before interviewing Foster and his friend John Martinez approximately one week later.

A commissioner entered a "Temporary Sexual Assault Protection Order" and scheduled a hearing. Prior to the hearing, Foster submitted a declaration in opposition to issuance of a sexual assault protection order. Foster also submitted a declaration

5

from Deputy Bertrand and a memorandum from the Whatcom County Chief Deputy Prosecutor.

In his declaration, Foster states that he had consensual sexual intercourse with Olivia three times that day. According to Foster, "We were both pretty drunk, and Olivia threw up at one point," but when "Olivia felt better," he asked if she wanted to have sex again, and she said, " '[Y]es.' " Foster said that "[a]fter the sex," they watched a movie and went to "pick up John Martinez." According to Foster, "Everything seemed fine. Nothing seemed abnormal."

Deputy Bertrand states that he interviewed Olivia and Foster, and another detective interviewed Martinez. Deputy Bertrand said that Olivia "struck me as emotionless and very matter of fact and did not seem upset by the events that occurred, [and] maintained only one instance of sexual intercourse had taken place." Deputy Bertrand states that by contrast, Foster admitted having sex with Olivia three times and "gave a complete and full statement of what had happened." Deputy Bertrand states that he "found [Foster] to be very forthright and sincere." Deputy Bertrand also said that according to the detective who interviewed Martinez, Martinez said that Foster and Olivia did not appear "to be intoxicated" and "all seemed normal."

Deputy Bertrand says that "based upon my general experience in investigation of crimes of this type and a number of factors," including the interview of Martinez, he recommended against filing criminal charges. The memorandum from the Whatcom County Chief Criminal Deputy states that after talking to Deputy Bertrand and reviewing the file, there was insufficient evidence to file a criminal charge. The memorandum

states, in pertinent part:

> After drinking, what appears to be a large amount of alcohol (vodka, beer, wine), [Foster and Olivia] had sexual intercourse. The details of this contact are not entirely consistent. [Foster] recalls having sex on three occasions at this [sic] house. [Olivia] recalls only one occasion. [Olivia] reports that she [t]old him "NO" repeatedly and at one point hit his head. [Olivia] appears to have significant gaps in her memory which I expect is due to alcohol toxicity.
>
> A third party, a mutual friend, who was present with them several hours after the events, reports seeing nothing unusual in their behavior together other than them holding hands during the time he was with them.

At the beginning of the hearing on September 15, the commissioner told the parties that calling witnesses to repeat the testimony in the declarations was not necessary. Deputy Bertrand and Foster were the only witnesses who testified at the hearing.

Foster's testimony was very limited. Foster testified that the phone records showed that he and Olivia exchanged over 130 text messages on Saturday July 16.

Deputy Bertrand testified about the interviews with Olivia and Foster. Deputy Bertrand said that he never spoke to Martinez. But Deputy Bertrand said that he placed "great emphasis" on what Martinez told the other detective because Martinez was a "mutual friend," and that Martinez's version of events "was the primary reason" he did not arrest Foster. However, on cross-examination, Deputy Bertrand admitted that he assumed Martinez was a mutual friend.

> Q. [I]n your declaration you stated that you placed great emphasis on [Martinez's statement] because they were mutual friends?
> A. Correct.
> Q. That John Martinez was a mutual friend of both the petitioner as well as the respondent, correct?
> A. Correct.
> Q. Would it surprise you to know that the very first time that the petitioner actually met John Martinez was on the 16th, which was one day prior to the alleged rape?

7

A.    Yeah. That would be surprising.

. . . .

Q.    But you made that assumption . . . [t]hat they were mutual friends?

A.    Absolutely.

Deputy Bertrand admitted that he did not interview Christopher Poole or Kaleigh and Dustin Effinger. Deputy Bertrand also agreed that the delay in interviewing Foster and Martinez could have influenced their testimony.

Q.    . . . . Is there the possibility that either [Foster or Martinez] may have discovered or that word may have spread that there was an allegation of rape and a possible investigation?

A.    Absolutely.

Nonetheless, Deputy Bertrand testified that he was not concerned about the inconsistent statements because Olivia was a "very small young lady and there was a lot of alcohol, so it would not surprise me if she didn't remember."

The commissioner denied the request to issue a sexual assault protection order.

The memory lapses, the voluntary intoxication of alcohol, of the statement of Chief Deputy Prosecutor Mac Sutter [sic], the recommendation of the investigating Deputy Sheriff's office to not charge[,] the conflicts in the statements presented by various individuals.
I'm sorry, Ms. Charbonneau, there just is insufficient evidence to justify the issuance of a sexual assault protection order.

The order dismissing the petition states, in pertinent part: "No permanent Order for Protection shall issue because: evidence does not support a Sexual Assault Protection Order as set forth in this Court's oral ruling."

Donna Charbonneau filed a motion to revise the commissioner's decision denying the request to issue a sexual assault protection order, and her motion to seal, redact, or strike information set forth in the declaration of Deputy Bertrand that was protected by the Criminal Records Privacy Act, chapter 10.97 RCW, and the Public Records Act, chapter 42.56 RCW.

8

The court rejected Foster's argument that the court should give deference to the commissioner. The court ruled that as a matter of law, the commissioner's decision was improperly based on Olivia's intoxication. The court ruled the commissioner erred in failing to take into account the statutory requirement prohibiting denial of a protection order based in whole or in part on voluntary intoxication.

> So I then go back and look at the provisions of the statute regarding sexual assault protection orders, and keeping in mind that the Court can in this instance make its own independent determination based upon the record below as to whether or not there is a basis for such an order. I'm going to look at it from that perspective. . . . [D]enial of an order cannot be based in whole or in part on evidence that the petitioner was intoxicated.
>
> I think Commissioner Verge in his decision clearly relied upon that, and he spoke to it in many, many instances, and spoke to it in detail as to how he believed that impacted the petitioner's ability to recall or her behavior or her response to the events of the day. I think that's inappropriate under the context of the statute.

The court also concluded the commissioner "relied very heavily on Detective Bertrand's testimony" and did not take into account the other testimony in the record.

Based on the record, the court found that by a preponderance of evidence, Olivia was a victim of nonconsensual sexual intercourse. The superior court ruled that Donna Charbonneau was entitled to issuance of a sexual assault protection order on behalf of her daughter.

> [L]ooking at the evidence as was presented to Commissioner Verge, and only that evidence[,] by a preponderance of the evidence, the petitioner has established that this was non-consensual, because of not only what she has said and done, but because of the fact that she was intoxicated to the level that she was.
>
> That would indicate to me that her free will was impacted and her recollections may be impacted, and under a circumstance such as this, the Court would have to find that a person who is in that condition may be incapable of giving the necessary consent . . . . She's never told anybody that she gave consent. What she's told people is that she didn't. That's consistent with the behavior, I think, of someone who has been placed in her situation.

9

Therefore, I think that the commissioner in his reading of the evidence made his decision, but I can't agree with his decision. I don't think his decision is necessarily one that I would find to be appropriate under the evidence that has been presented here and under the provisions of the statute as they apply.

So it is my belief and my decision that the denial of the order should be revised, that an order should be entered; that the terms of that order should be that there is to be no contact between the respondent and the petitioner in the language of the statute; that that no contact include non-physical contact with her directly, indirectly, or through third-parties, regardless of whether those third parties are on the order. In other words, no emails, no phone calls, no texting, no letters, no notes, nothing, no contact of any sort to her directly or through a third-party with her.

The court entered a sexual assault protection order. The court denied the request to strike, seal, or redact Deputy Bertrand's declaration. Foster appeals the decision to issue the sexual assault protection order. Donna cross appeals denial of the motion to strike, seal, or redact Deputy Bertrand's declaration.

ANALYSIS

Standard of Review on Revision

Foster contends that the superior court on revision erred by reviewing the record de novo. Foster argues that because Foster and Deputy Bertrand testified, the superior court should have determined whether substantial evidence supported the commissioner's decision.[4]

The decision of a court commissioner is subject to revision by the superior court. RCW 2.24.050.[5] RCW 2.24.050 provides, in pertinent part:

All of the acts and proceedings of court commissioners hereunder shall be subject to revision by the superior court. Any party in interest may have such revision upon demand made by written motion, filed with the clerk of the superior court, within ten days after the entry of any order or judgment

---

[4] Whatcom County Civil Rule 53.2(a) provides: "All revisions of Commissioner rulings shall be de novo on the record made by the Commissioner, based only [sic] those materials, papers and pleadings in the court file and previously submitted to the Commissioner."

[5] See also WASH. CONST. art. IV, § 23.

of the court commissioner. Such revision shall be upon the records of the case, and the findings of fact and conclusions of law entered by the court commissioner.

On revision, the superior court reviews de novo the findings of fact and conclusions of law of the commissioner based upon the evidence and issues presented to the commissioner. State v. Ramer, 151 Wn.2d 106, 113, 86 P.3d 132 (2004).[6] Where the superior court does not agree with the decision of the commissioner on revision, we review only the superior court decision. Ramer, 151 Wn.2d at 113.

Foster relies on State v. Lown, 116 Wn. App. 402, 66 P.3d 660 (2003), to argue the superior court erred in reviewing the record de novo. The court in Lown held that on revision, the superior court reviews the commissioner's findings for substantial evidence. Lown, 116 Wn. App. at 407-08.

In Ramer, our Supreme Court expressly disagreed with the holding in Lown. Ramer, 151 Wn.2d at 113 n.9. In Ramer, a number of witnesses testified during the hearing before the commissioner. Ramer, 151 Wn.2d at 110-12. On revision, the superior court reviewed the record and reversed the commissioner's decision. Ramer, 151 Wn.2d at 112. The Supreme Court held that according to RCW 2.24.050, "[o]n revision, the superior court reviews both the commissioner's findings of fact and conclusions of law de novo based upon the evidence and issues presented to the commissioner." Ramer, 151 Wn.2d at 113. The Court expressly states that "[a]ny language to the contrary in State v. Lown, 116 Wn. App. 402, 66 P.3d 660 (2003), is disapproved." Ramer, 151 Wn.2d at 113 n.9.

---

[6] See also In re Marriage of R.E., 144 Wn. App. 393, 406, 183 P.3d 339 (2008) (citing Ramer, 151 Wn.2d 113) (noting that under controlling Supreme Court precedent, the superior court reviews a commissioner's decision de novo); 14 KARL B. TEGLAND, WASHINGTON PRACTICE: CIVIL PROCEDURE § 3.13, at 42 (2d ed. 2009) (citing Ramer as holding that the superior court always reviews a commissioner's decision de novo "regardless of the nature of the evidence considered by the commissioner").

Foster also cites In re Marriage of Moody, 137 Wn.2d 979, 976 P.2d 1240 (1999), and Perez v. Garcia, 148 Wn. App. 131, 198 P.3d 539 (2009), to argue there is "an exception to the de novo review standard for cases in which credibility is involved." Neither case supports Foster's argument.

In Moody, the Supreme Court addressed whether a superior court may consider new evidence on a motion for revision, and affirmed the superior court's refusal to consider new issues and new evidence not raised at the hearing before the commissioner. Moody, 137 Wn.2d at 993. The Court held that the statute limits the superior court's review on revision to the record before the commissioner. Moody, 137 Wn.2d at 992-93. Foster points to the court's statement in Moody that "where the evidence before the commissioner did not include live testimony, then the superior court judge's review of the record is de novo." Moody, 137 Wn.2d at 993. But as we previously noted, the court in Ramer held that where live testimony is presented, review is still de novo. Ramer, 151 Wn.2d at 113.

Further, in In re Marriage of Rideout, 150 Wn.2d 337, 351, 77 P.3d 1174 (2003), the Court recognized that "where competing documentary evidence [has] to be weighed and conflicts resolved," trial courts make credibility determinations based on documents. And in In re Marriage of Dodd, 120 Wn. App. 638, 86 P.3d 801 (2004), the court held that on revision, the superior court "is authorized to determine its own facts based on the record." Dodd, 120 Wn. App. at 644.[7]

---

[7] The other cases Foster cites do not address the standard of review on revision. See In re Marriage of Langham, 153 Wn.2d 553, 106 P.3d 212 (2005) (addressing the standard of review that an appellate court applies to a superior court's decision, not a superior court's revision of a commissioner's decision under RCW 2.24.050); Rideout, 150 Wn.2d at 337 (same); In re Parentage of Jannot, 149 Wn.2d 123, 65 P.3d 664 (2003) (same); State v. Bartolome, 139 Wn. App. 518, 161 P.3d 471 (2007) (standard of review for criminal trials on stipulated records).

12

In Perez, the court addressed whether the superior court on revision erred in relying on evidence that was not presented to the commissioner. Perez, 148 Wn. App. at 138. In dicta, the court incorrectly cites to Dodd, 120 Wn. App. at 643, for the proposition that "[w]here the commissioner hears live testimony, . . . the superior court is to review the commissioner's findings of fact and conclusions of law for substantial evidence." Perez, 148 Wn. App. at 139. But contrary to the dicta in Perez, the court in Dodd states that "the superior court on revision may review factual determinations for substantial evidence, but is not limited to a substantial evidence inquiry under RCW 2.24.050." Dodd, 120 Wn. App. at 645.[8]

Foster also overstates the importance of the testimony of Foster and Deputy Bertrand. First, at the beginning of the hearing, the commissioner told the parties that he read each declaration multiple times, and that calling witnesses to repeat what was set forth in the declarations was not necessary.[9] Further, Foster's testimony was very limited. Foster testified about the number of text messages he and Olivia exchanged the day before. And while Deputy Bertrand testified at some length, the superior court on revision stated that "Detective Bertrand's testimony is less valuable in this case than the testimony of the parties in the case." The court ruled that as a matter of law, the commissioner improperly relied on the level of Olivia's intoxication.

> [The commissioner's] decision wasn't based on credibility so much as his decision was based upon what he thought was the fact that [Olivia] was so intoxicat[ed] that he couldn't rely on what she had provided in terms of her affidavit and the other information.

---

[8] (Emphasis added.)

[9] For example, right before the examination of Foster, the commissioner stated, "Go ahead counsel, again, recognizing I've read every word in the file multiple times and I've paid close attention to the testimony."

We conclude that the superior court on revision did not err in reviewing the record before the commissioner de novo.

In the alternative, Foster claims that de novo review of a commissioner's decision violates his procedural due process rights under the state and federal constitutions. "When a state seeks to deprive a person of a protected interest, procedural due process requires that an individual receive notice of the deprivation and an opportunity to be heard to guard against erroneous deprivation." Amunrud v. Bd. of Appeals, 158 Wn.2d 208, 216, 143 P.3d 571 (2006). Foster has the burden to show that he was deprived of a protected interest. Mathews v. Eldridge, 424 U.S. 319, 334-35, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

Foster does not clearly identify a protected interest. To the extent Foster claims his reputation is a protected interest, reputation alone is generally insufficient to trigger due process. See Nguyen v. Dep't of Health Med. Quality Assurance Comm'n, 144 Wn.2d 516, 541-42, 29 P.3d 689 (2001). And the case Foster relies on in support of his argument, Buffelen Woodworking Co. v. Cook, 28 Wn. App. 501, 505-07, 625 P.2d 703 (1981), holds that de novo review does not violate due process.[10]

Void for Vagueness

Foster claims the superior court violated his right to due process by relying on the statutory requirement that prohibits denial of a protection order based on voluntary intoxication, RCW 7.90.090(4).

---

[10] We do not consider the argument Foster makes that the de novo standard of review on revision violates substantive due process and equal protection. Further, Foster does not identify similarly situated classes or individuals or cite equal protection cases to support his argument. See Holland v. City of Tacoma, 90 Wn. App. 533, 538, 954 P.2d 290 (1998) ("Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration."); Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

RCW 7.90.090(1)(a) states that the court shall issue a sexual assault protection order "[i]f the court finds by a preponderance of the evidence that the petitioner has been a victim of nonconsensual sexual conduct or nonconsensual sexual penetration by the respondent."[11]

RCW 7.90.090(4) provides that denial of a sexual assault protection order shall not be based in whole or in part on evidence that "[t]he petitioner was voluntary intoxicated," or the petitioner "engaged in limited consensual sexual touching." RCW 7.90.090(4)(b), (c).

Foster argues that as applied, RCW 7.90.090(4) is unconstitutionally void for vagueness. Where a vagueness challenge does not implicate the First Amendment, we evaluate the statute as applied to the particular facts of the case and the party's conduct. City of Seattle v. Montana, 129 Wn.2d 583, 597, 919 P.2d 1218 (1996). The party asserting a statute is void for vagueness bears the burden of proving beyond a reasonable doubt that the statute does not make plain the conduct that is proscribed. State v. Halstien, 122 Wn.2d 109, 118, 857 P.2d 270 (1993). Under the due process clause of the Fourteenth Amendment, a statute is unconstitutionally vague if (1) the statute does not define the offense with "sufficient definiteness that ordinary people can understand what conduct is proscribed," or (2) it does not provide ascertainable standards of guilt to protect against arbitrary enforcement. City of Spokane v. Douglass, 115 Wn.2d 171, 178, 795 P.2d 693 (1990).

Giaccio v. Pennsylvania, 382 U.S. 399, 86 S. Ct. 518, 15 L. Ed. 2d 447 (1966), does not support Foster's argument that RCW 7.90.090(4) is unconstitutionally vague.

---

[11] The statute specifically mentions victims who do not report the rape and "cases in which the rape is reported [and] not prosecuted." RCW 7.90.005.

In Giaccio, the United States Supreme Court held that a Pennsylvania statue allowing the jury to impose costs on an acquitted criminal defendant was unconstitutionally vague. Giaccio, 382 U.S. at 402-03. The Court concluded the statute contained "no standards at all," and did not "place any conditions of any kind upon the jury's power to impose costs upon a defendant who has been found by the jury to be not guilty of a crime charged against him." Giaccio, 382 U.S. at 403. Here, unlike in Giaccio, the statute provides ascertainable standards.[12] See RCW 7.90.010(1), (4), (5) (defining "nonconsensual," "sexual conduct," and "sexual penetration").

Cross Appeal

In her cross appeal, Donna Charbonneau argues the superior court erred by not sealing or redacting the declaration of Deputy Bertrand to remove her daughter's name under GR 15 and the Criminal Records Privacy Act, chapter 10.97 RCW. We review a trial court's decision on a motion to seal or redact for abuse of discretion. Indigo Real Estate Servs. v. Rousey, 151 Wn. App. 941, 946, 215 P.3d 977 (2009). On a motion to seal or redact, the court considers a number of factors, including whether sealing or redacting is "effective in protecting the interests threatened." Seattle Times Co. v. Ishikawa, 97 Wn.2d 30, 37-39, 640 P.2d 716 (1982).

In denying the motion to seal the declaration under GR 15, the superior court properly considered the Ishikawa factors on the record. However, the court erred in denying the request to redact under RCW 10.97.130 on the grounds that "Deputy

---

[12] Foster also argues that the statute violates due process by precluding evidence of voluntary intoxication. Foster mischaracterizes the statute. RCW 7.90.040 does not remove consideration of intoxication from the fact finder, it merely requires that voluntary intoxication not be the basis for denial of a sexual assault protection order. For the first time in his reply brief, Foster claims that RCW 7.90.090(4) violates the doctrine of separation of powers. We do not address arguments raised for the first time in a reply brief. Cowiche, 118 Wn.2d at 809.

Bertrand is entitled, I think, as a citizen to present an affidavit in a civil matter." The record is clear that the information set forth in Deputy Bertrand's declaration is based on a criminal investigation of the rape allegation. Information identifying child victims of sexual assault is protected by the Criminal Records Privacy Act and exempt from public disclosure. RCW 10.97.130; RCW 42.56.240(5).[13] In <u>Bainbridge Island Police Guild v. City of Puyallup</u>, 172 Wn.2d 398, 418, 259 P.3d 190 (2011), the court held that the police officer's identity was exempt from disclosure under the Criminal Records Privacy Act even though the remainder of the investigative records were subject to disclosure.

We affirm the decision on revision to enter a sexual assault protection order but remand to redact the name of the juvenile victim from the declaration of Deputy Bertrand.

WE CONCUR:

_____, A.C.J.

_____ Cox, J.

---

[13] We note the 2012 and 2013 amendments to RCW 42.56.240 made no change to subsection (5) of the statute. <u>See</u> LAWS OF 2012, ch. 88, § 1; SUBSTITUTE H.B. 1612, at 1-2, 63rd Leg., Reg. Sess. (Wash. 2013).