IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Marriage of<br><br>SANDEEP ARUGONDA,<br><br>                  Respondent,<br><br>and<br><br>KEERTHI ANANTHULA,<br><br>                  Appellant. | No. 84401-6-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, A.C.J. — Keerthi Ananthula appeals from a heavily litigated and highly contentious dissolution and challenges many aspects of the final orders, as well as a number of posttrial orders, including rulings on motions for reconsideration. Ananthula asserts that the trial court failed to properly account for money transfers to family members during the marriage, erred as to the valuation and question of sale of the family home, miscalculated income for purposes of child support, imposed an unconstitutional condition on international travel with the children, and failed to rule on the question of abusive litigation. We disagree and affirm.

FACTS

Sandeep Arugonda and Keerthi Ananthula were married in India in 2012 and moved to Washington in 2015. Arugonda filed a petition for legal separation in December 2019, at which point the couple had two sons. Early in 2020, when

the court was considering temporary orders, both parties filed declarations leveling various accusations at one another as precipitating the breakdown of the marriage, alleging interference by the other's family in the marital happiness and finances, as well the alleged financial impropriety of the other spouse. Arugonda filed a memorandum in support of his position on matters to be resolved by the temporary orders. He argued that he should be able to return to India during the pendency of the legal proceedings because, as the non-custodial parent, he was not required to stay in the jurisdiction. In that same pleading, he urged the court to consider a downward deviation from the standard child support calculation because he anticipated that his gross income in India would be less than his income in the United States. A commissioner entered a temporary parenting plan on February 13, 2020, which gave both parties residential time and prevented relocation of either parent without notice to the other paren.

On February 15, 2021, an incident occurred when Ananthula attempted to pick up their oldest son from his residential time with Arugonda and she contacted the Issaquah Police Department. While the parties offered differing accounts to responding officers about what transpired, Arugonda was ultimately charged with assault in the fourth degree as a crime of domestic violence. A no contact order was issued on March 19. A few days later, the court linked the dissolution proceedings and Ananthula's domestic violence protection order (DVPO) petition so that the DVPO could be heard alongside the motion to modify the temporary orders in the dissolution case. Ananthula was granted a protection order on May

24 that suspended Arugonda's residential time under the parenting plan until the trial court could determine the scope of Arugonda's contact with the children.

Trial was largely conducted in April and May 2022, though it formally concluded in early July, during which the judge conducted an extensive review of the parties' finances, assets, and liabilities. The judge entered the parenting plan on May 5, 2022, followed by the child support order and accompanying worksheets on July 13. Two days later, the trial court issued its final divorce order and findings and conclusions about a marriage.

Both parties filed motions for reconsideration in late July 2022, challenging the valuation of specific accounts, the court's determination of issues relating to the former family home, and the appreciation or depreciation of other financial assets. On July 29, the court entered a ruling on procedural matters relating to the motions for reconsideration, including denial of some of Ananthula's issues and authorizing additional briefing on the remaining matters. Orders on each of the motions for reconsideration were entered on August 5, 2022.

Arugonda filed a notice of appeal on August 15 and Ananthula cross-appealed on August 25. Both parties amended their respective notices of appeal several times. However, Arugonda delayed in providing this court with clerks papers, exhibits, and a report of the proceedings, and ultimately failed to perfect his appeal within the time provided. Thus, Arugonda's appeal was dismissed, leaving only Ananthula's cross-appeal.[1] Despite the pendency of the appeal in

---

[1] At oral argument, Arugonda's counsel briefly asserted that some aspects of his appeal were still reviewable, but the ruling of the commissioners clearly establish that this is not the case. Wash. Ct. of Appeals oral arg., *In re Marriage of Arugonda*, No. 84401-6-I (Jan. 8, 2025), at 17

this court, the parties continued to engage in posttrial litigation, however the trial judge appropriately refrained from entering further orders without the authorization of this court.

ANALYSIS

I.      Transfers of Community Property Funds

Ananthula first argues that the trial judge failed to consider various money transfers Arugonda made to family members in India, before and after the divorce petition had been filed, and that these transfers should be counted against Arugonda as waste or concealment of community assets. There are three series of transactions that Ananthula alleges were improper; transfers from Arugonda to his father in 2013 and 2014, transfers to his cousin in 2019, and transfers to his own accounts in India from 2014 through 2017.

"A property division made during the dissolution of a marriage will be reversed on appeal only if there is a manifest abuse of discretion." *In re Marriage of Muhammad*, 153 Wn.2d 795, 803, 108 P.3d 779 (2005). "'A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons.'" *Id.* (quoting *In re Marriage of Littlefield*, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997)). Our statutory scheme demands that

---

min., 50 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://www.tvw.org/watch/?clientID=9375922947&eventID=2025011119.

On May 26, 2023, Commissioner Kanazawa expressly ruled, "I consider Arugonda's appeal abandoned. *The appeal is thus dismissed*." (Emphasis added.) Roughly four months later on September 26, 2023, Commissioner Koh ruled on Arugonda's "Motion for Appeals" and noted that Commissioner Kanazawa had "dismissed Arugonda's appeal as abandoned, leaving only Keerthi Ananthula's cross[-]appeal pending." Despite this fact, Arugonda filed a reply brief on August 9, 2024. Because he is not the appellant, but rather the respondent to Ananthula's appeal, and therefore not entitled to a reply, we decline to consider Arugonda's August 9, 2024 brief.

[i]n a proceeding for dissolution of the marriage . . . the court shall, without regard to misconduct, make such disposition of the property and the liabilities of the parties, either community or separate, as shall appear just and equitable after considering all relevant factors including, but not limited to:
(1) The nature and extent of the community property;
(2) The nature and extent of the separate property;
(3) The duration of the marriage . . .; and
(4) The economic circumstances of each spouse . . . at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to a spouse . . . with whom the children reside the majority of the time.

RCW 26.09.080. A court can only divide property that is before it; if property has already been disposed of "before trial, the court simply has no ability to distribute that asset at trial." *In re Marriage of White,* 105 Wn. App. 545, 549, 20 P.3d 481 (2001). "In making its property distribution, the trial court may properly consider a spouse's waste or concealment of assets." *In re Marriage of Wallace*, 111 Wn. App. 697, 708, 45 P.3d 1131 (2002). During a marriage, "either spouse . . ., acting alone, may manage and control community property, with a like power of disposition as the acting spouse . . . has over [their] separate property." RCW 26.16.030. There are exceptions, including that "[n]either person shall give community property without the express or implied consent of the other." RCW 26.16.030(2).

Ananthula asserts that the transfers to Arugonda's father were not repayment of a loan for wedding expenses, as Arugonda claimed, but in fact a gift of their community property to which she did not consent in violation of RCW 26.16.030(2). She highlights two aspects of the trial court's reasoning as erroneous. Ananthula contends that the trial court misapplied the "parent-child gift

presumption" and the "community debt presumption." Thus, she alleges that the result of these transactions was the reduction of community property, such that at the time of the dissolution, substantial community property was no longer available, which frustrated an equitable and just division.

In response, Arugonda argues the trial court explicitly found that "Arugonda had not wasted or concealed property" and credited his testimony about the size and cost of the wedding and his father's expectation of repayment for the wedding expenses that he had paid. Arugonda also claims that the trial court credited his testimony that because the funds were transferred to his father via Ananthula's account, she was aware of and therefore consented to the transfers at the time they occurred.

"[A]n unexplained transfer of money from a parent to a child raises the presumption that a gift was intended which can only be overcome by proof that is certain, definite, reliable and convincing, and leaves no reasonable doubt as to the intention of the parties." *Wakefield v. Wakefield*, 59 Wn.2d 550, 551, 368 P.3d 909 (1962); *see also In re Est. of Miller*, 134 Wn. App. 885, 895, 143 P.3d 315 (2006). This presumption can be overcome if it is proved that the money was advanced under an "'express or implied'" agreement that it will be repaid. *Miller*, 134 Wn. App. at 895 (quoting *Hafer v. Spaeth*, 22 Wn.2d 378, 384, 156 P.2d 408 (1945), *overruled on other grounds by Whitaker v. Spiegel, Inc.*, 95 Wn.2d 408, 623 P.2d 1147 (1981)). Here, the trial judge credited Arugonda's testimony that he had such an agreement with his father. We do not review credibility determinations of the trial court. *In re Marriage of Rideout*, 150 Wn.2d 337, 350-52, 77 P.3d 1174 (2003).

Further, "[a] debt incurred by either spouse during marriage is presumed to be a community debt." *Copper Leaf, LLC v. Ace Paving Co.* 31 Wn. App. 2d 726, 745, 553 P.3d 111 (2024). As such, any loans for the purpose of the wedding would have been community debt. Thus, the trial judge concluded that "in making that transfer Arugonda was acting in the community interest to repay a loan."

Ananthula also assigns error to the trial judge's ruling that credited Arugonda's testimony that the transfers to his cousin were business related. Arugonda responds that he had demonstrated at trial that the transfer was part of a business transaction, essentially to avoid bank transfer fees. The cousin then sent the funds, now converted to Indian rupees, to Arugonda's father who used them to pay off debt held by the family business. Again, we defer to the trial court's determinations regarding witness credibility. *Rideout*, 150 Wn.2d at 350-52. Here, we may not disturb the credibility determination made by the trial judge who agreed that this was the purpose of the transaction.

Finally, Ananthula assigns error to Arugonda's transfer of funds to his own accounts in India, asserting they were unauthorized and the trial court erred by concluding that Ananthula was aware of these transfers. Arugonda counters that Ananthula did not adequately pursue this matter during trial such that it is unpreserved for appeal, and that she both misconstrues the record and misreads Arugonda's financial records and mistakenly characterizes a transaction in Indian rupees as one in US dollars, drastically and artificially inflating the amount at issue. Implicit in Arugonda's argument here is that the failure to pursue this issue during cross-examination forecloses our review on appeal because it is not preserved.

RAP 2.5(a). He is correct that this particular challenge has not been properly preserved for appeal.

The trial court is in the best position to assess the credibility of those testifying before it and it has credited Arugonda's testimony as to the propriety of these challenged transfers. Because we may not review the trial court's credibility determinations underlying these rulings, Ananthula has failed to establish a manifest abuse of discretion on this issue.

II.     CR 2A Agreement

Ananthula next alleges that Arugonda agreed "in open court" to buy the family home for roughly $1.9 million and, citing CR 2A, asserts that the judge erred by not enforcing the resulting agreement. In support of this contention, she quotes from portions of the record where Arugonda offered to buy the house to help provide continuity for the children. Arugonda quotes from the same places in the record, but argues that while an offer was extended, Ananthula never accepted it. He points out that, instead, she expressly stated her preference to be awarded the house and for the value of the home "go into the ledger and the overall final distribution" of the property in the dissolution.

The formation and enforcement of agreements made in court are governed by CR 2A and RCW 2.44.010(1). CR 2A reads as follows:

> No agreement or consent between parties or attorneys in respect to the proceedings in a cause, the purport of which is disputed, will be regarded by the court unless the same shall have been made and assented to in open court on the record, or entered in the minutes, or unless the evidence thereof shall be in writing and subscribed by the attorneys denying the same.

RCW 2.44.010(1) explains that an attorney has the authority

> [t]o bind [their] client in any of the proceedings in an action or special proceeding by [their] agreement duly made, or entered upon the minutes of the court; but the court shall disregard all agreements and stipulations in relation to the conduct of, or any of the proceedings in, an action or special proceeding unless such agreement or stipulation be made in open court, or in presence of the clerk, and entered in the minutes by [them], or signed by the party against whom the same is alleged, or [their] attorney.

We review the question of the existence of a CR 2A agreement de novo. *See In re Marriage of Langham*, 153 Wn.2d 553, 559, 106 P.3d 212 (2005) (applying de novo standard of review to determine if there was CR 2A agreement between parties); *In re Marriage of Pascal*, 173 Wn. App 836, 841, 295 P.3d 805 (2013) (utilizing de novo review for interpretation of contract language). "The principles of the law of contracts apply to review of settlement agreements." *In re Est. of Harford*, 86 Wn. App. 259, 262, 936 P.2d 48 (1997). If the elements of CR 2A are met, the rule "supplements but does not supplant the common law of contracts." *In re Marriage of Ferree*, 71 Wn. App 35, 39, 856 P.2d 706 (1993). Thus, the party "who would recover on a contract must prove its existence and terms." *Id.* at 41. *Ferree* also provides that the analysis in initial determinations regarding a disputed CR 2A is akin to that for summary judgment; "[t]he burden is on the moving party to prove there is no genuine dispute regarding the existence and material terms of settlement." *Id.* Critical to our analysis here, a valid contract requires offer and acceptance. *In re Marriage of Obaidi*, 154 Wn. App. 609, 616, 226 P.3d 787 (2010).

The portions of the record cited by both parties support the conclusion that the offer was extended by Arugonda but not accepted by Ananthula, and thus,

there was no binding agreement to purchase the home. The last word from Ananthula's counsel on the matter was clear during the following exchange with the court:

> THE COURT: Well, I understand, okay, but I mean does the Respondent [(Ananthula)] want to buy the Petitioner [(Arugonda)] out or does the Respondent want the house awarded, just awarded to her? What does the Respondent want?
>
> [ANANTHULA]: It depends on what the value is placed on the house because if it is too much and doesn't have enough money for her to support herself and the kids, she'd want it to be—I think she'd want it to be sold. And if he wants to go for—if he wants to buy it for 1.9, then I guess that would be the—that would be the sales price. I don't know.
>
> THE COURT: Well, but let's—but the Respondent is advocating for a value of 1.6 and so if we set it at 1.6, is the Respondent going to buy the Petitioner out or what does the Respondent—
>
> [ANANTHULA]: The Respondent would like to be awarded the house at the 1.6 value.
>
> THE COURT: Just awarded the house? Not the—not awarded the house and required to pay the Petitioner half of the value, but just awarded the house?
>
> [ANANTHULA]: *Well, she wants to be awarded the house and it would go into the ledger and the overall final distribution that you're going to figure out and make.*

(Emphasis added.) Here, Ananthula asked for the sale price to be set at $1.9 million per Arugonda's offer, but did not actually accept his offer to purchase it at that or any other price. Instead, she expressly asked for the house to be awarded to her. Because there was no acceptance, there was no agreement to enforce under CR 2A, and thus, the trial court did not err.

III.    Admission of Updated Appraisal

Ananthula also challenges the admission of an updated appraisal from Arugonda's expert, Jesse Taylor, "[a]fter the date disclosure of expert opinions was due and discovery was cut off."   Ananthula asserts that this was a discovery violation under King County Superior Court Local Civil Rule 26(k)(3), which requires the disclosure of expert witness opinions prior to trial.  She further asserts that this violation was willful because Arugonda did not inform her that the appraisal was being updated, and it prejudiced her because she was unable to have her own expert review the new appraised value, which was $200,000 more than the previous evaluation.

We review the trial court's decision to admit or exclude witness testimony for an abuse of discretion.  *In re Dep. of M.P.*, 185 Wn. App. 108, 114-15, 340 P.3d 908 (2014).  Before a trial judge can exclude a "late-disclosed witness," they must "'explicitly consider'" if a "'lesser sanction would probably suffice,'" if the violation "'was willful or deliberate,'" and evaluate if the untimely disclosure would substantially prejudice the other party.  *In re Dep. of Lee*, 200 Wn. App. 414, 430, 404 P.3d 575 (2017) (quoting *Jones v. City of Seattle*, 179 Wn.2d 322, 338, 314 P.3d 380 (2013)).  We may not "'consider the facts in the first instance as a substitute for the trial court's findings.'"  *Id.* (quoting *Blair v. TA-Seattle E. No. 176*, 171 Wn.2d 342, 351, 254 P.3d 797 (2011)).

The trial court concluded that the untimely disclosure of the updated appraisal was a discovery violation, but also noted several circumstances that reduced any resulting prejudice to Ananthula.  The judge applied the proper

analysis under *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 933 P.2d 1036 (1997), and stated,

> So the motion to exclude Exhibit 146[, the updated appraisal,] is denied. I agree the *Burnet* analysis applies. It is a willful discovery violation because the exhibit was not timely disclosed by the discovery cutoff.
>
> But given that each side is going to have an appraiser, and given that [Ananthula] has seen an earlier appraisal from this expert, because the expert was timely disclosed, given that [Ananthula] will have the opportunity to cross-examine the witness, Jesse Taylor, given—and given that Respondent will have their own appraiser, I conclude that there's no prejudice to the Respondent to allowing this exhibit, and given the importance of the Court having accurate information as to the appraised value of the home, that excluding that exhibit is too drastic a measure. But I want to add that I'm willing to revisit this either after Jesse Taylor's testimony, or after Jesse Taylor's and then the Respondent's appraiser's testimony.

This excerpt from the report of proceedings clearly establishes that after explaining why there was minimal prejudice from the admission of the untimely appraisal, the judge ensured that Ananthula had further opportunity to object if needed. During Taylor's testimony, the judge directly asked Ananthula if she had any other objection to the admission of the untimely appraisal. Her counsel expressly responded, "Not if the witness is subject to cross-examination, of course not, Your Honor." Finally, the trial judge also gave Ananthula the opportunity to offer her own updated appraisal, but she failed to do so within the timeframe established by the trial court.

The record demonstrates that the judge properly considered the relevant factors under *Burnet* before allowing Taylor to testify regarding the untimely revised appraisal. He considered the potential for prejudice to Ananthula and took steps to mitigate it. The parties agreed to that mitigation which avoided the more

extreme option of completely excluding the witness. Thus, the trial court did not abuse its discretion on this issue.

IV.     Hearing on Abusive Litigation

Ananthula presented a motion to restrict abusive litigation in her response to a pretrial motion from Arugonda to exclude certain evidence, including that of a separate divorce proceeding he had initiated in India. She alleged that the motion to exclude was brought in "bad faith" and Arugonda was using the King County dissolution and the divorce proceedings in India to "force [her] to have contact with him even though she does not want to have contact," noting that the proceeding in India would "require Wife's personal appearance in India" to decide the same issues that Arugonda had already submitted to the Washington trial court to decide. A few weeks later at trial, Ananthula's counsel again raised concerns that she was going to have to travel to India to appear in the divorce proceeding there. The trial judge declined to enter an "anti-suit injunction" and encouraged the parties to try and resolve the matter amongst themselves. Ananthula's counsel did not pursue the matter further. Arugonda's brief argues that Ananthula's only step in furtherance of the abusive litigation hearing was filing the motion and that it was not adequately pursued at trial to entitle her to a hearing.

In the context of domestic relations proceedings, a court must find abusive litigation by a preponderance of evidence. RCW 26.51.060(1). Abusive litigation can be found if the opposing parties have a current or former intimate partner relationship, "[t]he party who is filing, initiating, advancing or continuing the litigation has been found by a court to have committed domestic violence against

the other party," and the primary purpose of the litigation is "harassing, intimidating or maintaining contact with the other party." RCW 26.51.020. The statute further requires that at least one of the following factors applies:

> (i) Claims, allegations, and other legal contentions made in the litigation are not warranted by existing law or by a reasonable argument for the extension, modification, or reversal of existing law, or the establishment of new law;
> (ii) Allegations and other factual contentions made in the litigation are without the existence of evidentiary support; or
> (iii) An issue or issues that are the basis of the litigation have previously been filed in one or more other courts or jurisdictions and the actions have been litigated and disposed of unfavorably to the party filing, initiating, advancing, or continuing the litigation.

RCW 26.51.020(1)(b).

Fatal to this assignment of error is the failure of Ananthula's counsel to seek a ruling on her motion or make a timely objection to the trial judge's implicit denial of an aspect of her motion. *See, e.g., In re Marriage of Monaghan*, 78 Wn. App. 918, 929, 899 P.2d 841 (1995) (explaining that after trial court makes tentative ruling party seeking ruling has obligation to pursue final ruling to ensure adequate record on appeal); *In re Marriage of Bowen*, 168 Wn. App. 581, 589-90, 279 P.3d 885 (2012); RAP 2.5(a). After being told that an "anti-suit injunction" regarding the divorce proceedings in India would not be forthcoming and the parties should resolve the issue through counsel, Ananthula made no objection, and counsel for both parties affirmateively agreed that they would try to settle it themselves:

> THE COURT: But I understand why you would raise that concern. I don't want to take it up anymore on the record. I think it's something you all can communicate about offline.
>
> . . . McCORMICK [(COUNSEL FOR ARUGONDA)]: I'll discuss with my client and get an answer to you, Mr. McGlothin.

. . . McGLOTHIN [(COUNSEL FOR ANANTHULA)]: Thank you.

. . . McCORMICK: Thank you.

"A party generally waives the right to appeal an error unless there is an objection in the trial court." *In re Adoption of K.M.T.*, 195 Wn. App. 548, 567, 381 P.3d 1210 (2016); *see also* RAP 2.5(a). Because counsel for Ananthula failed to seek a ruling on her motion or make a timely objection when the court implicitly denied it, she waived this issue for appeal and we need not consider this assignment of error further.

V.    Conditions on Travel To Certain Countries

Ananthula asserts that the conditions the judge imposed in the parenting plan regarding international travel are unconstitutional because the 14th Amendment to the United States Constitution "protects a fit parent's rights to make child rearing decisions for their children," and thus, any restriction should be reviewed under strict scrutiny as an infringement on that right. At oral argument before this court, Ananthula characterized the challenged travel condition as unrequested and asserted that the court can only act in the best interest of the children when prompted by conflict between the parents over an aspect of the parenting plan.[2] At oral argument, Arugonda reiterated his position as set out in his response brief and averred that the trial court did not err and, further, the condition is constitutional.[3] This is so, he asserts, because foreign travel is not a fundamental right, therefore strict scrutiny is not applicable, and because the

---

[2] Wash. Ct. of Appeals oral arg., *supra*, at 1 min., 10 sec.
[3] *Id.* at 10 min., 30 sec.

- 15 -

condition is in the best interests of the children, which the court has broad discretion to protect.

Here, the parenting plan states as follows:

Each parent shall notify the other parent at least 7 days prior to taking the children out of the United States, and shall provide to the other parent the dates of travel, flight information (airline, flight numbers, points of departure and arrival), and names of destination. *This is a notice requirement only: the traveling parent does not need the other parent's permission for international travel with the children.* The non-traveling parent shall cooperate with providing the children's passports to the traveling parent at least 5 days before the travel. The non-traveling parent shall cooperate in signing and providing to the traveling parent all documentation necessary to demonstrate that the children are authorized to travel with the traveling parent. *Neither parent may travel with the children to a country which is not a signatory to The Hague Convention on the Civil Aspects of the International Child Abductions, absent written consent from the other parent or a court order.*

(Emphasis added.) Ananthula focuses her briefing on the aspect of the travel conditions that requires permission from the other parent to travel with the children to a non-Hague nation.

"Trial courts have broad discretion to develop parenting plans." *In re Marriage of Mishko*, 23 Wn. App. 2d 571, 577, 519 P.3d 240 (2022). We review parenting plans for manifest abuse of discretion. *In re Marriage of Black*, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017). Our statutes authorize the trial court, through the terms of the parenting plan, to limit any conduct by the parents that the court "expressly finds adverse to the best interests of the child." RCW 26.09.191(3)(g). Before imposing restrictions pursuant to this rule, the trial judge "must find 'more than the normal . . . hardships which predictably result from a dissolution of marriage.'" *In re Marriage of Chandola*, 180 Wn.2d 632, 645, 372

- 16 -

P.3d 644 (2014) (alteration in original) (quoting *In re Marriage of Katare,* 175 Wn.2d 23, 36, 283 P.3d 546 (2012)). Actual harm need not have occurred; if substantial evidence shows "'that a danger of . . . damage exists'" then the trial court has discretion to impose restrictions in the best interests of the child. *Id.* (alteration in original) (emphasis omitted) (quoting *Katare,* 175 Wn.2d at 35-36).

Both parties rely on our Supreme Court's opinion in *Katare* in support of their respective positions because it presented the same question on similar facts. *Katare* follows precedent from the United States Supreme Court that establishes that there is no fundamental right to international travel. 175 Wn.2d at 41. In *Katare*, the father challenged a travel restriction that prevented him from taking the children to India. This was of particular concern for the mother because India is not a signatory of the Hague Convention on the Civil Aspects of International Child Abduction, "which provides for mandatory summary proceedings in cases of international child abduction," a remedy that is only available if both the home and visited countries are signatories. *Id.* at 30.

Here, the trial judge did not impose a total prohibition on international travel generally or travel to certain nations, but rather imposed only a narrowly-focused condition on travel to non-Hague countries. He stated,

> I'm not anticipating ordering that either party needs approval for domestic or international travel, provided the international travel is to a Hague country. The only permission would be if it was to a non-Hague country. And, otherwise, they're just notice provisions. They're not permission provisions.

As our Supreme Court recognized in *Katare*, if either parent made an unauthorized trip to non-Hague country, it would be difficult, or even impossible, for the other

- 17 -

parent to regain custody.  *Id.*  This is the potential harm to the children that could result from the absence of requirements like those imposed by the court here. Admittedly, the court's explanation of the provision regarding non-Hague nations was less than clear as he first referred to permission with regard to non-Hague countries, and then stated, "[o]therwise, they're just notice provisions.  They're not permission provisions."  When read in context, it is apparent that "otherwise" references all other travel, either domestic or to nations that are Hague signatories, for which the only requirement is notice.  The express language of the court set out in the parenting plan establishes that the only condition generally imposed on international travel, by either parent, is that notice be provided to the other parent.

At oral argument before this court, Ananthula alluded to apprehension about the dynamics of power and control with Arugonda, insinuating that a permission requirement could exacerbate any such circumstances between the parties.[4] However, the alternate means of satisfying the condition, obtaining an order of the court, addresses those concerns.  Should either party improperly withhold permission for such travel the remedy is to obtain permission from the court, thus unreasonable or abusive interpretation or exercise of this condition is disincentivized.  This is particularly true given the facts of this case where both parties anticipate travel to India to visit their respective families.  The notice requirement is not a de facto prohibition.  There is no constitutional right to international travel, so Ananthula has failed to demonstrate any constitutional

---

[4] *Id.* at 2 min., 58 sec.

violation as to the requirement for permission from the other parent prior to travel to a non-Hague country.

VI.    Child Support Calculations

Ananthula challenges the child support order, alleging that the trial court made several errors in its determinations of Arugonda's income and failed to provide written findings when it denied her request for an upward deviation from the standard support calculation. At oral argument, Ananthula further clarified that her primary issue with regard to this assignment of error was the lack of written findings, which interferes with meaningful review.[5] Before this court, Arugonda conceded that the trial judge should have made written findings and remand for that purpose was appropriate.[6]

We review a child support order for abuse of discretion. *In re Marriage of Condie*, 15 Wn. App. 2d 449, 472, 475 P.3d 993 (2020). "The amount of child support rests in the sound discretion of the trial court." *In re Marriage of Fiorito*, 112 Wn. App. 657, 664, 50 P.3d 298 (2002). "This court will not substitute its own judgment for that of the trial court where the record shows that the trial court considered all relevant factors and the award is not unreasonable under the circumstances." *Id.*

First, Ananthula alleges that Arugonda's capital gains from 2019-21 should have been considered as part of his income for the purposes of child support calculations as required by RCW 26.19.071(3)(m). Arugonda does not challenge

---

[5] *Id.* at 4 min., 20 sec.
[6] *Id.* at 12 min., 15 sec.

Ananthula's characterization of the controlling law, but instead relies on the trial judge's ruling that capital gains income from those years was nonrecurring, crediting Arugonda's testimony that the stock sales and the resulting gains were due to exceptional circumstances and not reflective of his normal income. While Ananthula is correct that RCW 26.19.075(1)(b) gives the trial court discretion to consider nonrecurring income in the calculation of support, the statute only says that the court *may* do so. Thus, the trial court had the discretion to not include it.

Second, Ananthula contends that the trial court was required to include Arugonda's contract-related benefits in its calculation of his monthly income based on RCW 26.19.071(3)(f); she specifically identifies money that he received for dependent care benefits, a reimbursement for disability insurance, and employee stock purchase plan benefits. Here, Arugonda avers that there is no authority to support including these benefits in the calculation of a parent's income and that the trial court plainly stated that if Ananthula wanted these benefits to be counted as part of Arugonda's income, then her own contract benefits would be included as part of her income because her employment contract conferred similar benefits.

Third, Ananthula avers that she is entitled to an upward deviation in the award of child support because Arugonda has not completed his treatment obligations under the DVPO and therefore is not yet allowed to exercise his full residential time under the parenting plan, which necessarily increases her financial burden. Arugonda responds that he is currently working on his obligations under the DVPO and is exercising as much residential time as he is allowed. He also

cites the following oral ruling of the trial judge who stated that the children's needs were being adequately met under the current child support amount:

> All right. I'm just going to put a stop to this. I am not granting the Respondent's [(Ananthula's)] request, right? The standard calculation is what the child support table says is the amount to support the children, right? And so the Respondent has a responsibility there and the Petitioner [(Arugonda)] has a responsibility there. And if child support is being paid and the Petitioner is the obligor and the Respondent is the obligee, then that means the Respondent and the Respondent's household is getting everything—has everything that the child support table says the children need for their support, so I am not going to grant that upward deviation.

The judge clearly concluded that the children's needs were being met under the current support amount and an upward deviation was unnecessary.

However, Ananthula is correct that the trial court failed to make a written finding as required by RCW 26.19.075(3) when it denied her request for deviation. Section 9 of the child support order states,

> Mother requested an upward deviation/adjustment to the Father's Child Support Transfer Payment retroactive to March 1, 2021, the month following his residential time being suspended by Temporary Domestic Violence Protective Order that suspended his residential time with the children to offset the additional costs the Mother incurred and expended for caring for the kids full time. *Her claim is denied.*

(Emphasis added.) RCW 26.19.075(3) states in relevant part, "The court shall enter *findings that specify reasons* for any deviation *or any denial of a party's request* for any deviation from the standard calculation made by the court." (Emphasis added.) While the court ruled on Ananthula's request for deviation, it failed to provide any finding that specified the reason for the denial as required by the statute.

The trial judge has broad discretion to fashion child support orders and, here, made all the proper considerations and entered an award that was reasonable. Thus, we affirm, but remand for entry of the required finding regarding the specific reason underlying the denial of Ananthula's request for an upward deviation.

VII.    Rulings After Entry of Final Dissolution Order

Ananthula assigns error to several posttrial rulings and orders. First, she alleges that Arugonda lacked any basis under CR 59 to request reconsideration by the trial court because his motion did not identify any of the specific grounds provided by the rule, and even if it did, those would not avail him. Second, she avers that the trial court's March 27, 2023 order granting CR 60(a) relief did not correct a clerical mistake because it exceeded the scope of the rule as it actually corrected a judicial mistake. Third, she argues the trial court's July 20, 2023 CR 60(a) order fails for the same reason as the March 27 order. At oral argument before this court, Ananthula characterized both the March 27 and July 20 rulings under CR 60(a) as "substantive decisions" that amounted to "reversals of the trial court's orders."[7]  Fourth, she contends that the trial court exceeded its authority under RAP 7.2(e) when it entered an amended final order of divorce and amended qualified domestic relations order (QDRO) because the trial court is required to obtain the permission of this court before it may enter orders that affect a decision under review. Finally, she asserts that the trial court entered an amended final order of divorce without properly providing her notice as required by CR 52(c). She

---

[7] *Id.* at 5 min., 50 sec.

contends this deprived her of procedural due process and the opportunity to object. Arugonda disagrees with these various arguments and asks this court to uphold the rulings of the trial judge.

### A. Reconsideration Pursuant To CR 59

A party may file a motion seeking vacatur of an order and entry of a new one on a variety of grounds, so long as the challenged order "materially affect[ed] the substantial rights" of the party. CR 59(a). We review such motions for an abuse of discretion. *In re Marriage of Dugan-Gaunt*, 82 Wn. App. 16, 18, 915 P.2d 541 (1996).

Here, Arugonda's motions relied on CR 59(a)(7) and (8). Reconsideration is available under subsection (7) if "there is no evidence or reasonable inference from the evidence to justify the verdict or the decision, or that it is contrary to law," and subsection (8) permits reconsideration of an "[e]rror in law occurring at the trial and objected to at the time by the party making the application." CR 59(a). He argues that the trial court's ruling on his CR 59 motion was proper because it retained jurisdiction over the parties and the court made changes that addressed the issues raised by both parties on reconsideration.

In this case, granting reconsideration was appropriate, particularly as to the double counting error made in the July 17, 2022 final divorce order and because the original order was not supported by the evidence. Certain funds had been counted twice in the spreadsheet entered alongside the divorce order, portions of the order which rested upon the spreadsheet necessarily lacked evidentiary support and required correction. Arugonda had a proper basis to bring a motion

under CR 59 to correct this double counting. Accordingly, correction of the orders upon reconsideration was not an abuse of discretion.

        B.      CR 60(a) Correction of Clerical Errors

CR 60(a) expressly allows for the correction of clerical errors and states,

> Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders. Such mistakes may be so corrected before review is accepted by an appellate court, and thereafter may be corrected pursuant to RAP 7.2(e).

We review rulings on CR 60 motions for abuse of discretion. *In re Marriage of Persinger*, 188 Wn. App. 606, 608, 355 P.3d 291 (2015).

Arugonda avers that both the March 27 and July 20 CR 60(a) orders were in fact corrections because the judge's intent was always clear and all the challenged orders did was rectify mistakes that did not reflect that intent. At oral argument before this court, Arugonda adhered to his position that these posttrial orders were designed to effectuate the court's intention and ensure that there was a 50/50 division of property, and modifying the equalization payment was intended to conform with this intent.[8] Arugonda also notes that the original underlying QDRO simply provided a valuation date, but did not specify the value the court assigned to the 401k account in question, and the July 20 CR 60 order corrected the QDRO by assigning the value that had been determined at trial.

Here, the court's ultimate rulings on Arugonda's CR 60(a) motions were proper. The court's stated intent in the final divorce order was a 50/50 division of

---

[8] *Id.* at 14 min., 45 sec.

property between the parties. The judge's correction was to adjust the equalization payment so as to fix the double counting and the incorrect figure that had been entered for the value of the QDRO. The desired distribution of property was clear from the initial final divorce order; all the subsequent CR 60 orders did was correct errors present in the July 15, 2023 final divorce order that were brought to the judge's attention in the posttrial litigation.

C.    Trial Court Compliance with RAP 7.2

Under RAP 7.2(a), "After review is accepted by the appellate court, the trial court has authority to act in a case only to the extent provided in this rule, unless the appellate court limits or expands that authority as provided in rule 8.3." Here, the trial court exercised its authority under RAP 7.2(e) which authorizes it "to hear and determine (1) postjudgment motions authorized by the civil rules, the criminal rules, or statutes, and (2) actions to change or modify a decision that is subject to modification by the court that initially made the decision." The trial court hears the party first and then decides if the relief sought will change the decision already on review and, therefore, if permission of the appellate court is required. RAP 7.2(e). "If the trial court determination will change a decision then being reviewed by the appellate court, the permission of the appellate court must be obtained prior to the formal entry of the trial court decision." *Id.*

Here, all of the changes made by the trial judge in the two challenged CR 60(a) orders were related to the distribution of property, mostly correcting values that had been entered in error; the original 50/50 division envisioned by the trial court did not change, nor did any other aspects of the final divorce order or child

support order. Arugonda relies on this fact and asserts that the trial did not exceed its authority under RAP 7.2 because the changes reflected in the amended orders were simply corrections of clerical mistakes that were properly conducted under CR 60(a) and the substantive decision of the trial court under review by this court was unchanged. We agree with Arugonda on this point. The trial judge acted within his authority when he corrected certain orders following trial within the constraints of RAP 7.2.[9]

D. Procedural Due Process

Ananthula avers that she was deprived of adequate notice under CR 52(c) when the court entered its amended final divorce order on January 30, 2024 and this infringed on her right to due process. Arugonda responds that because the posttrial proceedings were extensive, featuring several rounds of motions from both sides, but did not involve any new findings, Ananthula was not entitled to any additional notice.

"When a state seeks to deprive a person of a protected interest, procedural due process requires that an individual receive notice of the deprivation and an opportunity to be heard to guard against erroneous deprivation." *In re Marriage of McCann*, 4 Wn. App. 2d 896, 916, 424 P.3d 234 (2018); *see also Mathews v. Eldridge*, 424 U.S. 319, 348-49, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976); U.S. CONST. amend. XIV, § 1. Dissolution proceedings often implicate the liberty interests of

---

[9] The record further establishes that the trial judge appropriately considered the limitations on his ability to act once this court accepted review and, in fact, denied a number of other posttrial motions by the parties on the basis that ruling on them would violate RAP 7.2(e), and made further orders contingent on approval from the Court of Appeals.

the parties, "particularly when children are involved," and procedural due process prevents a wrongful deprivation. *McCann*, 4 Wn. App. 2d at 916.

CR 52(c) provides that the trial court "shall not sign findings of fact or conclusions of law until the defeated party or parties have received 5 days' notice of the time and place of the submission, and have been served with copies of the proposed findings and conclusions." The January 30, 2024 amended final divorce order at the center of Ananthula's due process challenge was the result of over a year of posttrial litigation. The only change effectuated by the amended order was the reduction of the equalization payment Arugonda was to make to Ananthula, which resulted from the various corrections made during posttrial litigation wherein both parties were active participants.

Specifically, the amended final divorce order reflects the correction of the court's valuation of the 401k account and its subsequent assignment to Ananthula through the amended QDRO, as well as reduction of the equalization payment that was accounted for by the assignment of the 401k to Ananthula. These changes were made pursuant to CR 59 and 60, but did not disturb the court's original findings and conclusions after trial; the judge intended to impose a 50/50 division of property and took steps to correct clerical mistakes that had frustrated that intent. Thus, CR 52 was not applicable; there were no new findings of fact or conclusions of law and the final divorce order was the only order changed. Ananthula does not establish what further process she was due, particularly given that she spent *over a year* litigating various issues after the July 15, 2022 divorce

order was entered. Accordingly, she has failed to carry her burden on her procedural due process claim.

## VIII. Attorney Fees

Ananthula avers that she is entitled to attorney fees on appeal based on the trial court's finding that Arugonda was intransigent in the dissolution proceedings. Arugonda also requests attorney fees without a specific basis beyond the difficulty of responding to Ananthula's brief. Neither of the parties' initial appellate brief mentions RAP 18.1, much less attempts to comply with the rule.[10]

"If applicable law grants to a party the right to recover reasonable attorney fees or expenses before . . . the Court of Appeals . . . , the party must request the fees or expenses as provided in this rule." RAP 18.1(a). We also have discretion to award attorney fees and costs in dissolution proceedings on appeal. RCW 26.09.140. "An important consideration, apart from the relative ability of the two spouses to pay, is the extent to which one spouse's intransigence caused the spouse seeking the award to require legal services." *In re Marriage of Buchanan*, 150 Wn. App. 730, 739, 207 P.3d 478 (2009). However, an award based on intransigence remains at our discretion as well.

Arugonda was previously ordered to pay Ananthula $16,985 due to his intransigence in the trial court proceedings. However, in order to award attorney fees on that basis at the appellate level, Ananthula would have to demonstrate that Arugonda was also intransigent on appeal. She has failed to do so. Further, she

---

[10] While Ananthula cites RAP 18.1 in her reply brief, it is well-settled that we do not consider arguments presented for the first time in reply. *Cowiche Canyon Conservancy v. Bosley,* 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

offers no authority that would allow us to impose a fee award based on intransigence in the trial court when the intransigent party has already been sanctioned for that conduct. More critically, given the highly contentious nature of the litigation between the parties, to which they have both contributed, and their ability to pay their own respective attorney fees, we decline to award fees to either party.

We affirm, but remand for the trial court to enter the required findings regarding the child support order.

WE CONCUR: