
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Parenting and Support of | ) ) ) | No. 39971-1-III |
| B.J.N.† | ) ) | |
| | ) | UNPUBLISHED OPINION |
| HEIDI SUMMERS, | ) ) | |
| Appellant, | ) ) | |
| RYAN ALAN NELSON, | ) ) | |
| Respondent. | ) | |

LAWRENCE-BERREY, C.J. — Heidi Summers petitioned the trial court for primary residential placement of the daughter she shares with Ryan Nelson. After a trial where Summers, acting pro se, repeatedly appeared in court intoxicated, the court awarded primary residential placement to Nelson and imposed parenting limitations on Summers.

Summers appeals, challenging (1) the factual basis for the trial court's findings, (2) the court's application of applicable statutes, and (3) the court's failure to grant continuances or a mistrial. Because the court's legal conclusions flowed correctly from

---

† To protect the privacy interests of the minor child, we use her initials throughout this opinion. Gen. Order for Court of Appeals, *In re Changes to Case Title* (Wash. Ct. App. Aug. 22, 2018) (effective September 1, 2018), http://www.courts.wa.gov/ appellate_trial_courts.

findings rooted in substantial evidence, and because the court acted within its discretion to deny Summers continuances or a mistrial, we affirm.

FACTS

In 2019, Heidi Summers petitioned the trial court for primary residential placement of B.J.N., the one-year-old daughter she shares with Ryan Nelson. Three years later, the court entered a temporary family law order granting Nelson joint residential care of the child. In 2023, the court held a trial to resolve Summers' petition.

*Trial: courtroom phase*

At the start of trial, the court asked Summers, pro se, whether she wished to argue her motion for a continuance so as to obtain new counsel. Summers said she did not expect to argue that motion, and she had been unable to obtain new counsel after her previous counsel withdrew.

In the first three days of trial, Summers elicited testimony from several witnesses, including (1) her father, John Dalton, (2) her brother, Derek Dalton, (3) her fiancé, Matthew Alward, and (4) herself. In turn, all of these witnesses testified that Summers did not abuse alcohol. This testimony conflicted with the following accounts Nelson and his witnesses later offered:

- On one occasion, Summers drank to excess while driving with B.J.N. and her other daughter in the car. Summers passed out at the wheel in a fast-food parking lot, forcing her father to retrieve her and her children.

2

- On another occasion, Summers called police to her house to report that a boyfriend, Christopher Hollmeyer, had choked her and thrown her against a chair.[1] When police arrived, however, they found no markings on Summers' neck and observed that the chair in question contained an undisturbed pile of folded laundry. One of the responding officers testified that Summers smelled powerfully of alcohol. Both B.J.N. and Summers' other daughter were present in the house during this incident.

- On about a dozen occasions, Summers smelled of alcohol when she delivered B.J.N. to exchanges.

- On one occasion, Summers was intoxicated to the point of staggering when she received B.J.N. for visitation.

- On another occasion, an altercation ensued when Summers' father accused her of breastfeeding while drunk. During that altercation, Summers' father threw her down two flights of stairs, dragged her across a floor, and threw her in a backyard pond. Summers suffered two black eyes. Both of Summers' children were present for the incident.

- On another occasion, Summers drank 12 ounces of vodka within a minute or two.

---

[1] Some of the details of this incident derive from body camera footage played in open court.

- On another occasion, Summers used alcohol as part of a suicide attempt. A blood analysis showed that her blood alcohol content (BAC) was 0.410, more than five times the legal limit to drive.

The trial court, itself, observed that Summers showed signs of intoxication. By the third day of trial, these signs became so pronounced that the court asked Summers if she would submit to a breathalyzer test. Summers denied having any alcohol during trial and refused the breathalyzer because "they've been doing this to me forever" and she was "just so sick of it." Rep. of Proc. (RP) (June 23, 2023) at 422. However, when the trial court was unwilling to continue the proceedings unless Summers demonstrated her sobriety, Summers submitted to the test. The test showed a BAC of 0.247—over three times the legal limit to drive.

The court suspended proceedings and resumed the following week. At that time, Summers submitted to and passed a second breathalyzer test. On that day, the court asked Summers if, given the events of the preceding week, she still denied she had a problem with alcohol. Summers replied she "would not consider it a problem." RP (June 26, 2023) at 457. She explained, if she were an alcoholic, she would not suffer alcohol-related "incidences [sic]" because she would better understand how much alcohol her body could tolerate. RP (June 26, 2023) at 457. Nevertheless, Summers agreed to seek treatment if the trial court "[thought] it would be beneficial for the situation." RP (June 26, 2023) at6 457. Summers did not say that she believed treatment was appropriate.

Although the trial continued, Summers before the day concluded began exhibiting symptoms of withdrawal and ultimately experienced a seizure. The court again suspended proceedings and, in deference to Summers, permitted a 17-day recess for her to receive treatment.

Within two days of resuming trial, the court again noted that Summers was slurring her speech and otherwise exhibiting "some of the behaviors that we had when this trial first started." RP (July 21, 2023) at 1025. However, Summers was by that time appearing remotely and could not submit to a breathalyzer test. Because only rebuttal witnesses and closing arguments remained, the parties stipulated to concluding the trial in writing. The court directed the parties to submit rebuttal testimony by declarations and closing arguments by written statements.

Before this, the court had heard testimony and considered photographs establishing that B.J.N., when Summers delivered her to exchanges, frequently exhibited severe bruising all over her body. Summers downplayed this bruising by suggesting (1) the photographs were misleading, and (2) the bruises were attributable to B.J.N.'s active lifestyle. Summers also delivered B.J.N. to exchanges in a state of disheveled hygiene.

The court also had heard testimony from Nelson and his mother establishing that Nelson himself had once had a severe alcohol dependency, before achieving a decade of sobriety. Although Nelson had relapsed in 2018, he had received inpatient treatment and had been sober for the ensuing five years. Nelson's mother also testified that Nelson had

5

completed a 40-hour parenting course. Nelson's roommate testified that Nelson had a loving, healthy relationship with B.J.N.

Finally, the court had considered evidence establishing that Summers, on separate occasions, had accused Nelson and also his roommate of unsubstantiated sexual misconduct. In one instance, a Child Protective Services investigator had concluded that an adult had likely coached Summers' older daughter into making accusations against Nelson. While the investigator did not specifically identify Summers as the coaching adult, she concluded that Summers seemed to be using the allegations of misconduct to gain the "'upper hand'" against Nelson in court. Resp't Ex. 11 at 449. Summers had also accused Nelson of being a drug dealer, causing law enforcement, in 2018, to raid his home and freeze his assets. The investigation resulted in only a marijuana possession charge against Nelson. The investigation resulted in a marijuana possession charge against Summers as well.

*Trial: written phase, findings and conclusions, parenting plan*

Sixteen days after the court ordered rebuttal evidence to be submitted by written declarations and closing to be in writing, Summers filed her closing argument. That day, she also filed a motion for mistrial and a motion to continue. Twelve days later, Summers filed an additional motion to continue and a motion to stay proceedings.

Two days later—and without addressing Summers' motions—the trial court entered (1) findings of fact and conclusions of law, and (2) a parenting plan. As relevant to this appeal, the court found the following:

6

- Summers' perjury with respect to her drinking problem had rendered her testimony not credible.

- Summers' witnesses had enabled her drinking and, by virtue of denying that drinking, also were not credible.

- Summers' alcoholism constituted "a severe . . . addiction for which she should have, a long time ago, sought treatment." Clerk's Papers (CP) at 217.

- Summers failed to care for B.J.N.'s hygiene. Summers also had subjected B.J.N. to physical abuse, and would likely—in the event she retained custody—subject the child to "future grievous bodily injury." CP at 224.

- Notwithstanding Nelson's history of substance abuse and relapse, he, along with his mother and roommate, "provide[d] a loving and nurturing environment" for B.J.N. CP at 222.

Among other conclusions of law, the court determined that Summers' alcohol impairment, neglect, and abusive use of conflict together warranted RCW 26.09.191 limitations. By contrast, the court determined that Nelson had taken action to rehabilitate himself and demonstrated a stronger and more stable relationship with the parties' daughter. Although the court found Summers' parenting limitations dispositive of B.J.N.'s placement, it nevertheless analyzed B.J.N.'s placement under the RCW 26.09.187(3) factors.

The final parenting plan imposed limitations against Summers and awarded Nelson sole residential placement of B.J.N. Under the plan, Summers' limitations could sunset if she successfully remedied her parenting deficiencies.

Summers appealed the trial court's orders. One month after appealing, she again moved to stay the trial court's proceedings. The record does not indicate how—or whether—the trial court responded to this motion.

## ANALYSIS

### A.    RESIDENTIAL PLACEMENT AND LIMITING FACTORS

Summers argues the trial court improperly entered orders without substantial evidence. Although we agree with Nelson that Summers' argument fails where she does not adequately identify the specific findings she wishes to challenge, we nevertheless note that substantial evidence supports the trial court's findings.

*Standard of review*

This court reviews a trial court's parenting plan provisions for abuse of discretion. *In re Marriage of Littlefield*, 133 Wn.2d 39, 46, 940 P.2d 1362 (1997). A trial court operates within its discretion where its findings derive from the factual record, its conclusions apply sound law, and its decisions are not manifestly unreasonable. *In re Marriage of Bowen*, 168 Wn. App. 581, 586-87, 279 P.3d 885 (2012).

Where a trial court in a family law matter enters findings of fact, those findings must derive from substantial evidence. *In re Marriage of Rideout*, 150 Wn.2d 337, 352, 77 P.3d 1174 (2003). Substantial evidence is that quantum of evidence necessary to

persuade a fair-minded person of the truth of the premise. *In re Dependency of J.D.P.*,

17 Wn. App. 2d 744, 755, 487 P.3d 960 (2021).

*Findings supporting parenting plan*

Here, the trial court's findings fall broadly into three categories: findings

discrediting Summers and her witnesses, findings warranting parenting limitations

against Summers, and findings establishing Nelson's fitness as a parent. Substantial

evidence supported the findings in each category.

### i. Discrediting Summers and her witnesses

All of Summers' witnesses testified that she did not abuse alcohol.[2] Then, on the

third day of trial, the breathalyzer test Summers underwent revealed a BAC of over three

times the legal limit to drive. This test corroborated the trial court's observation that

Summers, throughout trial, had exhibited signs of intoxication. When trial resumed,

Summers was sober but within hours suffered a withdrawal-related seizure. When trial

resumed a third time, the court again noticed signs of impairment.

Clearly, when an individual (1) drinks heavily before appearing pro se in court,

(2) suffers withdrawal-related seizures, and (3) continues, later in the proceedings, to

exhibit signs of impairment, that individual has a severe drinking problem. Those closest

to Summers—her father, brother, and fiancé—would certainly have known about this

---

[2] The only witness Summers called who did not deny her alcohol dependency was
Nelson himself, who testified both during Summers' case in chief and his own.

problem. That both they and Summers had denied these problems discredited all four of them as witnesses.

### ii. Warranting parenting limitations

Trial courts may impose parenting limitations under RCW 26.09.191(3) if the parent, among other deficiencies, (1) has neglected their child, (2) suffers from a "long-term impairment" resulting from alcohol abuse, or (3) has engaged in the abusive use of conflict. A party engages in the abusive use of conflict where, generally, they leverage bad-faith litigation against an intimate partner to prevail in a domestic dispute. RCW 26.51.020. Where a parent has physically abused their child, the trial court must impose parenting limitations. RCW 26.09.191(2)(a)(ii).

Here, the trial court's findings related to all four of the above factors—alcohol abuse, neglect, abusive use of conflict, and physical abuse—derived from substantial evidence. However, because any one of those factors on its own justifies parenting limitations (and in the case of physical abuse, requires parenting limitations), we focus only on the two factors where the evidence is strongest.

First, there can be no question that Summers suffers from a severe alcohol dependency that inhibits her ability to parent. In addition to her inebriation at trial, testimony established that Summers regularly drank while caring for her children and engaged—as a result of that drinking—in risky, violent behavior. Specifically, she (1) passed out at the wheel with her children in the car, (2) regularly smelled of alcohol when delivering B.J.N. to exchanges, (3) was once staggering drunk when receiving

10

B.J.N. at an exchange, (4) drank to potentially fatal levels while attempting suicide, and (5) called law enforcement, while drinking with her children present, to make an indisputably false domestic violence report against Nelson.

Second, Nelson offered testimony and robust photographic evidence proving that Summers physically abused B.J.N. while the girl was in her care. Specifically, the photographs Nelson offered showed a pattern of Summers delivering B.J.N. to exchanges with bruises all over her body. In some cases, those bruises indicated cranial injuries. Summers offered no explanation for the injuries except to suggest that the photographs were misleading or else the injuries were attributable to B.J.N.'s active lifestyle.

Again, credible evidence also supported the conclusion that Summers neglected B.J.N. by failing to care for her hygiene and engaged in the abusive use of conflict where she coached her older daughter into accusing Nelson of molesting her. However, these findings are superfluous given the abundant evidence supporting the court's findings related to alcohol dependency and physical abuse.

### iii. Establishing Nelson's fitness as a parent

While Nelson admitted his history of alcoholism, he also testified without credible contradiction that in the last 15 years he had relapsed only once, for a three-month period. Testimony from Nelson's mother corroborated this. Testimony also established, without credible contradiction, that Nelson had completed a 40-hour parenting course, and that he—together with his mother and roommate—had created a loving, nurturing environment for B.J.N.

11

Although Summers does not adequately identify the specific findings she challenges, we nevertheless conclude that substantial evidence supports its findings to justify (1) parenting limitations against Summers, and (2) Nelson's fitness as a parent.

B.  CONTINUANCES, MISTRIAL, PROCEDURAL ERRORS, BIAS

Summers argues that various trial court errors warrant reversal. The claimed errors are denied continuances, a denied mistrial, procedural irregularities, and bias. We disagree such errors occurred. But even were we to agree that one or all did, the cumulative effect still would be harmless.

Washington courts shall "disregard any error or defect in pleadings or proceedings which shall not affect the substantial rights of the adverse party, and no judgment shall be reversed or affected by reason of such error or defect." RCW 4.36.240.

Here, the trial court imposed parenting limitations on Summers because she manifestly has a severe alcohol dependency that inhibits her ability to parent and because abundant evidence showed that Summers had physically abused B.J.N. Because Summers' witnesses endeavored to conceal her alcohol dependency, their testimony lacked credibility. As a result, no credible evidence contradicted the testimony of Nelson's witnesses, who testified that Nelson, through treatment, had overcome his alcohol dependency and become a fit parent.

We do wish to note, after a careful review of the record, the trial judge evidenced no bias against Summers. On the contrary, the judge extended Summers great patience and courtesy. She tolerated Summers' consistent lateness to trial, assisted Summers in

12

navigating the demands of pro se representation, and—most notably—twice suspended the proceedings, once because of Summers' intoxication, and the other due to Summers' withdrawal-related seizure. The trial judge accommodated Summers' alcohol dependency by permitting written submissions, rather than risk the safety of Summers and others by requiring Summers to drive to court. We commend the trial judge for her handling of this difficult situation.

C.    ATTORNEY FEES

Nelson requests an award of attorney fees, describing Summers' appeal as frivolous and without basis. He fails to cite a statute or rule for his request. A majority of the panel prefers not to grant Nelson's request.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, C.J.

WE CONCUR:

Staab, J.

Hazel, J.P.T.†

---

† The Honorable Anthony Hazel is a Superior Court Judge sitting in Division Three under CAR 21(c).